**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE MEDICAL SOCIETY OF THE STATE OF NEW YORK, on behalf of its members, *et al.*,<br><br>　　　　　　　　　Plaintiffs<br><br>　　v.<br><br>UNITEDHEALTH GROUP INC., *et al.*,<br><br>　　　　　　　　　Defendants. | Civil Action No. 1:16-cv-05265-JPO |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Cyril V. Smith
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Telephone: (410) 332-0444
Facsimile: (410) 659-0436


John W. Leardi
BUTTACI LEARDI & WERNER, LLC
103 Carnegie Center, Suite 323
Princeton, NJ 08540
Telephone: (609) 799-5150
Facsimile: (609) 799-5180

*Attorneys for Plaintiffs*

D. Brian Hufford
Jason S. Cowart
Anant Kumar
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor
New York, NY 10022
Telephone: (212) 704-9600
Facsimile: (917) 261-5864

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

ARGUMENT ........................................................................................................................ 3

I.      PLAINTIFFS AT A MINIMUM SHOULD BE AFFORDED AN OPPORTUNITY FOR ADDITIONAL DISCOVERY. ................................................................. 3

II.      UNITED HAS WAIVED RELIANCE ON THE ANTI-ASSIGNMENT PROVISIONS AT ISSUE, OR ELSE CONSENTED TO ASSIGNMENT. ............... 4

       A.      Where United finds claims payable, it virtually always pays the provider, and considers such payment to be "honoring" the assignment. ...................... 6

       B.      Even where claims are denied, United's systems still recognize the provider as the valid assignee. ........................................................................... 10

       C.      Evidence shows United deals directly with providers when claim denials are appealed. ....................................................................................... 13

       D.      Where United believes it has overpaid benefits, it seeks to recover such payment from the provider, not the patient. ................................................... 14

III.      CESAS MAY SUE IN ITS CAPACITY AS AUTHORIZED REPRESENTATIVE OR ATTORNEY-IN-FACT FOR THE PATIENTS WHOSE CLAIMS ARE AT ISSUE. ................................................................................................................. 18

IV.      UNITED'S MOTION IS NOT MATERIAL TO CESAS'S CLAIM FOR INJUNCTIVE OR DECLARATORY RELIEF, OR TO THE SCOPE OF THE PUTATIVE CLASS. ............................................................................................ 22

       A.      Class relief is unaffected by the Court's determination of whether these 18 plans have enforceable anti-assignment provisions. ................................... 22

       B.      United has not moved with respect to Patient BE, who is covered under a COC, and therefore resolution of this Motion cannot possibly alter CESAS's ability to sue under fully-insured plans. .......................................... 25

CONCLUSION .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Advanced Orthopedics and Sports Medicine v. Blue Cross Blue Shield of Mass.*,
Civil Action No. 14-7280 (FLW)(LHG), 2015 WL 4430488 (D.N.J. July 20, 2015) ............ 17

*American Orthopedic & Sports Medicine v. Independence Blue Cross Blue Shield*,
890 F.3d 445 (3d Cir. 2018) ................................................................................... 2, 17, 19

*Amnesty America v. Town of West Hartford*,
361 F.3d 113 (2d Cir. 2004) ................................................................................................ 5

*Biomed Pharma., Inc. v. Oxford Health Plans (NY), Inc.*,
No. 10 Civ. 7427(JSR), 2011 WL 803097 (S.D.N.Y. Feb. 18, 2011) ..................................... 16

*Brand Tarzana Surg. Inst., Inc. v. Int'l Longshore and Warehouse Union-Pac. Mar. Ass'n*
*Welfare Plan*, 706 F. App'x 442 (9th Cir. 2017) ..................................................................... 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................................ 3

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007) ............................................................................................ 2, 23

*Critchlow v. First UNUM Life Ins. Co. of Am.*,
378 F.3d 246 (2d. Cir. 2004) ............................................................................................... 9

*Eden Surg. Ctr. v. Cognizant Tech. Solns. Corp.*,
720 F. App'x 862 (9th Cir. 2018) ....................................................................................... 17

*Encompass Office Solutions., Inc. v. Conn. Gen. Life Ins. Co.*,
Civil Action No. 3:11-CV-0248-L, 2017 WL 3268034 (N.D. Tex. July 31, 2017) ............. 9, 20

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
424 F.3d 195 (2d Cir. 2003) ................................................................................................ 9

*Lauder v. First Unum Life Ins. Co.*,
284 F.3d 375 (2d Cir. 2002) .............................................................................................. 12

*Lewis v. Casey*,
518 U.S. 343 (1996) .......................................................................................................... 24

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) ........................................................................................................ 2

*Lunts v. Rochester City Sch. Dist.*,
515 F. App'x 11 (2d Cir. 2013) ............................................................................................ 3

*Lutheran Med. Ctr. of Omaha, Neb. v. Contractors, Laborers,*
 *Teamsters and Engineers Health and Welfare Plan*, 25 F.3d 616 (8th Cir. 1994)................... 20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)................................................................................................... 6

*Mbody Minimally Invasive Surg., P.C. v. Empire Healthchoice HMO, Inc.*,
 No. 13-cv-6551 (TPG), 2014 WL 4058321 (S.D.N.Y. 2014) ................................... 17

*Merrick v. UnitedHealth Grp., Inc.*,
 175 F. Supp. 3d 110 (S.D.N.Y. 2016) .......................................................... 5, 16, 17

*Munnelly v. Fordham Univ. Faculty and Admin. HMO Ins. Plan*,
 16 Civ. 5632 (PGG), 2018 WL 1628839 (S.D.N.Y. Mar. 30, 2018)........................ 11

*Neale v. Volvo Cars of N.A., LLC*,
 794 F.3d 353 (3d Cir. 2015) ............................................................................. 23, 24

*Neuroaxis Neurological Assoc., PC v. Cigna Healthcare of N.Y., Inc.*,
 No. 11 Civ. 8517 BSJ AJP, 2012 WL 4840807 (S.D.N.Y. Oct. 4, 2012) ............... 16

*Neuroaxis Neurosurg. Assoc., PC v. Costco Wholesale Co.*,
 919 F. Supp. 2d 345 (S.D.N.Y. 2013) .................................................................... 17

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v.*
 *Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705 (2d Cir. 2013) ................................ 20

*Pepe v. Newspaper and Mail Deliveries'-Publishers' Pension Fund*,
 559 F.3d 140 (2d Cir. 2009) .................................................................................... 9

*Peterson v. UnitedHealth Grp., Inc.*,
 242 F. Supp. 3d 834 (D. Minn. 2017)................................................................. 14, 15

*Premier Health Ctr., P.C. v. UnitedHealth Grp.*,
 Civil Action No. 11-425 (ES), 2012 WL 1135608 (D.N.J. April 4, 2012) ................ 5

*Premier Health Ctr., P.C. v. UnitedHealth Grp.*,
 No. Civ. 11-425(ES), 2014 WL 4271970, (D.N.J. Aug. 28, 2014), *order vacated to certify*
 *class without condition*, 2014 WL 7073439 (D.N.J. Dec. 15, 2014)........................ 7

*Premier Health Ctr., P.C. v. UnitedHealth Grp.*,
 292 F.R.D. 204 (D.N.J. 2013)............................................................................. 14-15

*Protocare of Metro. N.Y., Inc. v. Mut. Ass'n Admin., Inc.*,
 866 F. Supp. 757 (S.D.N.Y. 1994) ....................................................................... 7, 16

*Rojas v. Cigna Health and Life Ins. Co.*,
 793 F.3d 253 (2d Cir. 2015) ................................................................................... 23

*United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Teikoku Pharma USA, Inc.*,
    Case No. 14-md-02521-WHO, 2015 WL 4397396 (N.D. Cal. July 17, 2015) ....................... 20

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
    956 F.2d 1245 (2d Cir. 1992) ................................................................ 22

## STATUTES, RULES, AND REGULATIONS

29 U.S.C. § 1132 ................................................................................ 1, 19

29 U.S.C. § 1133 ................................................................................ 11, 20

Fed. R. Civ. P. 23 ............................................................................... 2, 22, 24

Fed. R. Civ. P. 56 ............................................................................... 3, 4

29 C.F.R. § 2560.503-1 .......................................................................... 11

## OTHER AUTHORITIES

Gregory F. Jacob, *Participant vs. Healthcare Provider: Who Holds the ERISA Rights?*,
    23 No. 4 ERISA Litig. Rep. NL 4 (Nov. 2015) ................................................ 18, 23

Gregory F. Jacob, *Provider "Standing" Wars Continue*,
    24 No. 3 ERISA Litig. Rep. NL 4 (Sept. 2016) ................................................ 20-21, 23

## INTRODUCTION AND SUMMARY OF ARGUMENT

United's motion for partial summary judgment (the "Motion," Doc. 108) is premature because there is still relevant discovery to be taken. Indeed, United produced nearly half of the documents owed from its ESI custodians just five days ago (July 21, 2018) – that is, a month-and-a-half after the Court's scheduling order required it (June 8, 2018). Part I, *infra*. Nevertheless, even on the current record, there are three fatal flaws in United's Motion.

First, United's anti-assignment provisions are unenforceable because of United's actual course of conduct in processing claims. Even the partial record available today demonstrates a wholesale, uniform practice of ignoring plan terms, including anti-assignment clauses; knowingly honoring provider assignments in virtually all cases; and dealing directly with providers at every step of claim adjudication. Either United has consented to assignment or it has waived the prohibition. It cannot hide behind generic "no waiver" plan provisions that might as well read: "United can take all actions consistent with a known relinquishment of a right to stand on this anti-assignment clause, and yet such actions do not constitute waiver." In addition, United's stated reason for denying claims from Plaintiff Columbia East Side Ambulatory Surgery, P.C. ("CESAS") is not, and never has been, an ineffective assignment. As one United employee with responsibility for claims processing stated in a 2015 declaration – filed in court *on behalf of United* – "United's claims processors … never review anti-assignment provisions contained in health plans." United cannot do one thing in the real world, then pretend before this Court that the exact opposite occurred. Part II, *infra*.

Second, United's argument does not challenge CESAS's capacity to sue[1] as attorney-in-fact or authorized representative for the patients in question. The Third Circuit's 2018 decision in

---

[1] Throughout its Motion, United refers to this as an issue of "standing." That is incorrect: the Motion addresses whether CESAS can meet the cause-of-action requirements of 29 U.S.C. § 1132(a), not subject-matter jurisdiction

*Am. Orthopedic & Sports Medicine v. Independence Blue Cross Blue Shield*, 890 F.3d 445 (3d

Cir. 2018), explains why an assignment of benefits is a wholly different basis for bringing suit

from a power-of-attorney or authorized-representative designation. Because CESAS has been

designated as attorney-in-fact and authorized representative for most of these patients, it can

bring these claims in their names. The Court's earlier decision at the motion to dismiss stage –

made on the pleadings – should not bind it here, especially in light of the compelling, intervening

decision in *American Orthopedic*. Part III, *infra*.

     Third, United characterizes its Motion as an effort to limit the future class, but the Motion

will not "streamline the ongoing litigation," Motion at 2, in any practical fashion – it will

certainly not shrink the volume of class claims or plans implicated. Under controlling Second

Circuit precedent, CESAS as assignee can serve as a representative of a class otherwise made up

of the typical assignors, that is, the patients. *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards

& Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007). United has not argued that CESAS lacks a valid

assignment for *all* of the 72 claims.[2] Thus, either CESAS will serve as representative of a class

made up of itself and other office-based surgery ("OBS") providers, or it will serve as

representative of a class of the patients who United has (also) shortchanged, or some hybrid.

Moreover, CESAS's claim for injunctive and declaratory relief will proceed – alongside a

prospective Rule 23(b)(2) injunctive class – regardless of whether CESAS brings 72 or 53 claims

to the table. Either way, United will have to answer for its illegal policy of uniformly denying

---

under Article III. *See generally Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387-88 & n.4 (2014). As United's counsel has previously explained, this question is *not* a matter of standing. *See* Ex. 6 at 2-3; Ex. 5 at 2.

[2] Indeed, many of the plans implicated in the CESAS claims do not have provisions barring assignment to the servicing provider, and United does not challenge here the validity of CESAS's assignments without such a clause.

OBS facility fees, and will do so with respect to a class largely unchanged in scope. Part IV, *infra.*

United's Motion *is* useful for one purpose, however: it underscores the propriety of class treatment in this case. United's Motion takes plan provisions with differing language, and properly treats them as "substantively identical." *See* Motion at 2, 9, 14, 15; *see also id.* at 16-19 (treating all payment-authorization provisions "similarly" despite language variations). United's position here should be remembered when class certification comes around: even where plan language varies, adjudication *en masse* is still preferred.

## ARGUMENT[3]

### I.     PLAINTIFFS AT A MINIMUM SHOULD BE AFFORDED AN OPPORTUNITY FOR ADDITIONAL DISCOVERY.

Rule 56(d) of the Federal Rules of Civil Procedure (formerly Rule 56(f)) provides a mechanism for this Court to defer consideration of United's Motion until Plaintiffs have had an opportunity to obtain discovery "essential to justify [their] opposition." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (noting that "parties had conducted discovery," which avoided problem of party being "'railroaded' by a premature motion for summary judgement"). A party must submit a declaration showing "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13 (2d Cir. 2013).

Although Plaintiffs believe the evidence described below is sufficient to demonstrate that genuine disputes of material fact exist, the detailed Rule 56(d) Declaration submitted herewith

---

[3] In general, United's Motion, *see id.* at 3-5, accurately describes the background and procedural history of the case. Plaintiffs' counter-statement of material facts identifies those specific factual contentions that Plaintiffs disagree with, and also sets forth additional facts material to the dispute. Plaintiffs have therefore omitted a fact section in this response.

sets forth specific, identifiable items of discovery that bear on the enforceability of United's anti-assignment clauses. To take two prominent examples, United has missed this Court's document production deadline by a month-and-a-half (with nearly half the documents produced on Saturday, July 21), and Plaintiffs have not yet had any chance – let alone an adequate opportunity – to take relevant deposition discovery. If the Court does not deny United's Motion outright, at a minimum it should allow Plaintiffs to gather the discovery set forth in the Declaration. Plaintiffs' opposition may then be supplemented and the Motion decided on a complete factual record.

## II.   UNITED HAS WAIVED RELIANCE ON THE ANTI-ASSIGNMENT PROVISIONS AT ISSUE, OR ELSE CONSENTED TO ASSIGNMENT.

United's sole basis for summary judgment is that anti-assignment provisions in certain plans bar assignment, and United is correct that the *starting* point for analysis is the plan documents. *See* Motion at 2 (claiming the Court can resolve the Motion "on the face of the plan documents"). Also, Plaintiffs agree with United's assertion that the plans at issue are "governed by the terms set out" in the Certificates of Coverage (COCs) and Summary Plan Descriptions (SPDs) that United has produced. Motion at 6; SMF[4] ¶¶ 7-8.

The analysis, though, does not *end* there. United presents no evidence about how it handles claims theoretically subject to anti-assignment clauses. But this Court must analyze United's actual conduct in processing claims – from initial adjudication, through appeals, and even post-payment recoupment – to determine whether United has (1) waived reliance on the plans' anti-assignment provisions, or (2) effectively consented to assignment. As explained below, there is ample evidence creating a triable dispute of fact on this issue. *See* Rule 56(a)

---

[4] Citations to "SMF" refer to the Statement of Material Facts submitted herewith. Per this Court's Individual Practice 3(F)(iii), the SMF incorporates Defendants' entries in their Rule 56.1 statement, Plaintiffs' responses, and additional Plaintiffs' facts that are numbered consecutive to Defendants' entries.

(United must show "there is no genuine dispute as to any material fact and [it is] entitled to judgment as a matter of law"). In evaluating the parties' positions, the Court is "required to view the evidence in the light most favorable to [Plaintiffs]" and "draw all reasonable inferences in favor of [Plaintiffs]." *Amnesty Am. v. Twn. of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).

As with any contractual provision, a claim fiduciary waives an anti-assignment provision where it "voluntarily or intentionally relinquish[es] a known right." *Merrick v. UnitedHealth Grp., Inc.*, 175 F. Supp. 3d 110, 122 (S.D.N.Y. 2016). Where a fiduciary like United has "regular interaction" with the provider "prior to and after claim forms were submitted, without mention of United's invocation of the anti-assignment clause," then such actions "impede United['s] … ability to rely on [an] anti-assignment provision to challenge [the provider's] standing." *Premier Health Ctr., P.C. v. UnitedHealth Grp.,* No. Civ. 11-425(ES), 2012 WL 1135608, at *10 (D.N.J. April 4, 2012).

The record here establishes at least a genuine dispute about whether, in the real world, United has committed acts amounting to a wholesale waiver of anti-assignment provisions across its entire claim-processing operations – including, of course, its handling of the 19 claims here.[5] **<u>First</u>**, when United initially adjudicates a claim, its internal systems and protocols uniformly, to quote United, "honor assignments." As a result, when United issues payment, it pays providers directly. **<u>Second</u>**, even when United denies a claim, it continues to recognize the provider as the valid assignee. If there were no acceptable assignment, United would not process claims from a non-network provider at all – after all, such a provider is otherwise a complete stranger to the plan. At no point in the process for denying claims does United consult plan documents to check for anti-assignment provisions, much less rely on those provisions. **<u>Third</u>**, when a provider

---

[5] Contrary to the United's throwaway line, Plaintiffs' argument here does not ask the Court to "reconsider its previous ruling." Mot. at 2. The Court's motion to dismiss decision did not address waiver or consent.

appeals a claim denial, United continues to deal directly with the provider. **Finally**, in instances

when, post-payment, United believes that it overpaid benefits, it seeks to recover payment from

the provider – not the member – again evidencing its recognition of the provider as the valid

assignee. A "rational trier of fact," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986), could certainly find either that United waived reliance on its anti-

assignment clauses, or consented to CESAS's assignments.

> ### A.   Where United finds claims payable, it virtually always pays the provider, and considers such payment to be "honoring" the assignment.

United's waiver begins at the start of claims processing. United has no mechanism for

consulting plan anti-assignment terms when processing claims, and sees no need to do so. *See*

SMF ¶¶ 52-63, 66, 70-72, 75-80, 85-88. United has a "Standard Operating Procedure" for the

"Assignment of Benefits" that expressly states ███████████████████████████████████

██████████████████████████████████████████ *See* SMF ¶ 53. The only

exception to such provider-directed payment is *not* based on plan language, ██████████

████████████████████████████████████████████████████

██████████████████████████████████████ *See* SMF ¶¶ 55-

57.

Thus, when United finds claims are covered and benefits payable, it pays those claims to

the provider, and it does so *with the understanding that it is honoring the assignment*. *See* SMF

¶¶ 52-54, 58-63. Indeed, deposition testimony from a recent case shows that United employees

responsible for claims processing are unfamiliar with the very concept of anti-assignment

provisions. *See* SMF ¶ 92; Ex. 14 (Thompson Dep.), at 42:7-43:2 ("Q: Do you know what an

anti-assignment clause is? A: No. Q: So would it be correct to say then that since you don't know

what an anti-assignment clause is you never had occasion during the 20 years that you did and

supervised claims administration you never had occasion to refer to, use, invoke, or apply an anti-assignment clause? A: I wouldn't know.") (objections omitted). In CESAS's specific instance, for the 72 CESAS claims at issue in Plaintiffs' suit, the professional fees connected to the surgeries were virtually all paid to the provider, demonstrating either United's consent to assignment, or its knowing waiver of the anti-assignment clause.[6] *See* SMF ¶ 65. Only two were not, and they are not among the 19 claims for which United seeks judgment. *See id*.

United argues that such payments do not prove waiver, because it is simply honoring "patient requests to route benefit payments directly to providers," as allowed by certain plan provisions. *See* Motion at 15. But these additional provisions actually render the anti-assignment clauses ineffectual. As Judge Mukasey has held in a similar case, "[a]lthough the Plan does contain an anti-assignment provision, it also provides for the possibility of direct payment to the health care provider. If the Plan had intended to prevent all assignments, as defendants claim, then it would not have preserved the discretion to pay [provider] directly." *Protocare of Metro. N.Y., Inc. v. Mut. Ass'n Admin., Inc.*, 866 F. Supp. 757, 761-62 (S.D.N.Y. 1994) (Mukasey, J.) (citations omitted) (holding that provider had standing to bring suit as a "beneficiary" via assignment, despite anti-assignment clause). And as another court has explained, in the case of United specifically, "[t]his language merely makes clear that United may, in its discretion, unilaterally *waive* the anti-assignment provision and pay benefits directly to the provider." *Premier Health Ctr., P.C. v. UnitedHealth Grp.*, No. Civ. 11-425 (ES), 2014 WL 4271970, at *15 (D.N.J. Aug. 28, 2014) (emphasis added), *order vacated to certify class without condition*,

---

[6] The Court will recall that CESAS's surgeries generally resulted in a professional fee, for the surgeon, and a facility fee, for use of the accredited, staffed OBS facility. United paid the professional fee in every case, demonstrating that the procedure was medically necessary and covered by the plan. *See* Exs. 3-2 and 3-4 (spreadsheets of professional fee payments on these claims).

2014 WL 7073439 (D.N.J. Dec. 15, 2014). Far from preventing waiver, United's chosen language actually proves that waiver has occurred.

Moreover, United's Motion provides no factual basis for invoking this patient-authorization escape hatch, making such provisions irrelevant. United claims that it pays providers only because plan participants have requested such payment. *See* Motion at 15-19. But United produces no evidence  either that (a) a *patient* ever submitted to United a written request for direct-to-provider payment, as required by the provisions United now cites,  or (b) United ever actually considered such a submission. *See* Motion at 8 (Patient AS's plan says it will pay a provider directly "if *you* [the patient] provide written authorization to allow this"); *id.* at 8-9 (Patient K's plan says "*[y]ou* [the patient] may request Us to make payment … directly to Your Provider"); *id.* at 9-10 (Patients AJ and AZ's plans say "*You* [the patient] may request Us to make payment directly … to the provider") (emphases added in all). Instead, United relies on *providers'* submissions, such as paper forms (or their electronic equivalent) where the provider simply checks a box noting its authority. *See, e.g.*, SMF ¶¶ 63-64, 66.

Many of United's cited provisions also allow for assignment upon "consent." *See* Motion at 13, 14. But United similarly provides no explanation of what "consent" to assignment looks like in its real-world operations. The reason is that no such process or "consent" exists, or has ever been invoked. Again, United relies on the provider's submission of a claim form that says, in essence, "I have an assignment from the patient." *See* SMF ¶¶ 58-59, 63-64, 66. Once United sees a claim form like this, it issues payment (or, as discussed below, denial) to the provider solely on the basis of that assertion, i.e., provides "consent." The only reasonable inference from such conduct (or at least *a* reasonable inference) is that United has honored the assignment, as opposed to invoking the provisions it trots out now as a *post hoc* rationalization for its real-world

8

conduct. The alternative would be to read the "consent" provision as mere surplusage – a result which "is not preferred and [to] be avoided if possible." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2003)

United's Motion thus fails to show the absence of a genuine dispute of fact. *See Encompass Office Solns., Inc. v. Conn. Gen. Life Ins. Co.*, Civil Action No. 3:11-CV-0248-L, 2017 WL 3268034, at *13 (N.D. Tex. July 31, 2017) (rejecting insurer's motion for summary judgment on the basis of anti-assignment provisions in part  because it "did not move for summary judgment on the ground that its consent was not obtained for the assignments at issue").

Indeed, a number of United's plans make clear that direct payment to a provider constitutes an assignment: "pay[ing] the provider directly [is] referred to as assignment[]." *See* SMF ¶¶ 26, 27, 29, 31.[7] And although the language that United relies on makes it sound like directed-to-patient payment is the norm, that is not true. *See supra* at 6 █████████████ ████████████; SMF ¶¶ 52-57, 65, 68-69 (explaining that vast majority of claims for which Defendants have produced payee data are directed to providers). This disconnect underscores the utterly fictitious premise of United's arguments here. Unlike in a galaxy far, far away, United may not use Jedi mind tricks and simply declare that "these aren't the [consents to assignment or waivers of anti-assignment] you're looking for."[8] After all, courts must interpret plans "in an *ordinary and popular sense* as would a *person of average intelligence and experience*." *Pepe v. Newspaper and Mail Deliveries'-Publishers' Pension Fund*, 559 F.3d 140, 147 (2d Cir. 2009) (quoting *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d. Cir. 2004))

---

[7] United may argue that in *some* instances, this quoted language comes from a provision that was later supplanted by a "reimbursement rider." But that circumstance does not change the concept of what an assignment really is, as described by United itself in the plans.

[8] *Star Wars Episode IV: A New Hope* (1977).

(emphases added). United should not be allowed to evade the import of its real-world conduct by cramming contradictory, superfluous, and nonsensical qualifying language into its plan documents.

     **B.**     **Even where claims are denied, United's systems still recognize the provider as the valid assignee.**

Plaintiffs acknowledge that the 19 claims at issue in United's Motion were denied as to CESAS's facility charges, but, to be clear, United's waiver is *not* predicated simply on payment of claims.[9] Rather, it is woven into United's claim adjudication system, which ignores many specific plan terms, including anti-assignment clauses. *See* SMF ¶ 57, 66, 77, 80-81, 85-88. Thus, United's Standard Operating Procedure on Assignment of Benefits is not solely geared toward payment (especially when read drawing all inferences in favor of Plaintiffs). *See* Ex. 10

████████████████████████████████████████████████████████████

████████████████████████████████████. Notably, throughout its motion papers, United never asserts that it actually "reviewed" or "considered" the plan documents in adjudicating these 19 claims – the best it can muster is the careful, lawyerly language that such documents are "relevant to" how United handled the claim. *See* Motion at 5; SMF ¶ 20.

United's Motion therefore fails to assert a key, material fact – that it consulted the plans during its processing of the claims, rather than just now during litigation – and this omission alone is enough to give rise to a genuine, triable dispute. *See* Ex. 35 (Price Dep.), at 26:2-16 (Q: But you did not review patient plan documents as manager of Grievances and Appeals? A:

---

[9] United may argue that its professional-fee payment is distinct from the facility-fee denial, but that is not true. The question is whether United has waived the anti-assignment provision as a whole, or at least for a given plan – not for a specific claim – through its course of dealing. The professional fee from Dr. Antell arises from the same course of medically necessary, covered treatment as the facility fee from his solely-owned and operated OBS practice, CESAS. The Motion does *not* assert a distinction between United's denial of the facility fee and payment of the professional fee – instead, it solely attempts to argue that direct-to-provider payment is not waiver. *See* Motion at 15-19.

Correct. Q: Are you familiar with what an anti-assignment clause is? A: No. Q: When you were the manager of Grievances and Appeals and Audit and Recovery, did the people you supervised ever review plan[] documents? … A: No.") (objections omitted).

Thus, even when it denies claims, United still recognizes that the provider has a valid assignment. The choice to honor a provider assignment is antecedent to, or independent of, the decision whether or not to pay that claim. After all, the claims spreadsheet for the "universe"[10] of denied OBS facility-fee claims for defendant Oxford shows that the recognized assignee *in United's systems themselves* is the provider in virtually all instances.[11] *See* SMF ¶¶ 67-69. And *none* of the provider explanations of initial denials that United sent to CESAS for these 19 claims ever asserted the existence of an anti-assignment clause as cause for the denial. *See* SMF ¶¶ 82-84. Because United did not assert the anti-assignment clauses in originally handling the claims – before litigation – it cannot do so now. *See* 29 U.S.C. § 1133 (benefit denials must "set[] forth the specific reasons for such denial, written in a manner calculated to be understood by the participant"); 29 C.F.R. § 2560.503-1(f), (g) (requiring notification of an "adverse benefit determination within a reasonable amount of time," and that such notification state "the specific reason or reasons for the adverse determination" as well as "[r]eference to the specific plan provisions on which the determination is based"); *Munnelly v. Fordham Univ. Faculty and Admin. HMO Ins. Plan*, 16 Civ. 5632 (PGG), 2018 WL 1628839, at *16-*19 (S.D.N.Y. Mar. 30, 2018) (emphasizing that proper notice is necessary to avoid claimants being "sandbagged by

---

[10] More accurately speaking, partial universe. The claim spreadsheets produced by United so far are tied to specific denial codes that United's counsel has asserted do not necessarily cover the full scope of OBS facility-fee denials. Nevertheless, United has disclaimed any need at this stage of the proceedings to do a more exhaustive or precise search.

[11] Such ████████████ data is missing for the claims that were submitted under non-Oxford United plans. Plaintiffs have asked Defendants to supplement their production, but Defendants have not done so. *See* Kumar Rule 56(d) Declaration at ¶ 16(a).

after-the-fact plan interpretations devised for purposes of litigation," and explaining that an

"unasserted defense" can be waived as long as it does not "create coverage where none would

otherwise exist") (quoting *Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 381-82 (2d Cir.

2002)).

Indeed, United failed to deny claims on the basis of anti-assignment provisions even in

the face of direct requests to timely assert such clauses. For at least six of the claims (Patients S,

AJ, AK, AR, BM, and BQ), United was sent an assignment-of-benefits form that stated:

> Should this assignment be prohibited in part or in whole under any anti-assignment provision of my policy/plan, I instruct my applicable insurance plan … to please advise and disclose to Provider in writing such anti-assignment provision within 30 days upon receipt of my assignment, otherwise this assignment should be reasonably expected to be effective and such anti-assignment is waived on any pending claims for benefits under the respective policies.

*See* SMF ¶ 46. United provides no evidence that it complied with such instruction. As to these

six claims, this constitutes an additional basis for waiver.

As emphasized by an employee in United's Claim Operations Department, in a written

declaration filed in a lawsuit on United's behalf, "United's claims processers … never review

anti-assignment provisions contained in health plans." SMF ¶ 66. And the OBS denial process

that United set up, much like its overall claim adjudication process, made no provision for

checking plan anti-assignment terms. *See* SMF ¶¶ 70-80. These denials are solely a function of

███████████████████████████████ that slated claims for automatic denial. *See id*.

Whether a claim is paid or denied, the early evidence shows that, as a standard practice,

claims are adjudicated without reference to plan terms. Anti-assignment terms are no exception.

Opposing counsel has already informed the Court that United does not consult plan documents

when adjudicating claims. *See* SMF ¶ 86. This is not surprising, because United's interrogatory

responses carp about the practical inaccessibility of plan documents. *See* SMF ¶ 85. As noted above, United employees deposed in a prior action, who were responsible for claim adjudication, were wholly unfamiliar with the concept of anti-assignment provisions and admitted that they did not affect real-world claim processing. *See* SMF ¶ 92.

United may argue that its "consultation" of plan terms occurs when it wires the logic of a plan into its "claim engine," the software that decides most claims on an automatic basis. But in response to persistent requests from Plaintiffs for information reflecting how individual plans are reflected in United's claim engine, the only documents United has produced thus far as bearing on this question are "Benefit Detail Reports" or similar documents – and these documents are silent on the question of anti-assignment. *See* SMF ¶¶ 86-88. In short, the current record indicates that United's claim-processing systems always rely on standard assignment-of-benefit logic discussed above, whether a denial or payment is the ultimate result.

### C.  Evidence shows United deals directly with providers when claim denials are appealed.

United's waiver continues after initial claim adjudication. Once United initially denied CESAS's facility-fee claims, it continued to deal with CESAS directly on appeal. The claim files for the claims at issue are replete with examples of appeal correspondence between United and CESAS or CESAS's billing company. *See* Ex. 1; *see also* SMF ¶¶ 73, 81, 84 (United inviting appeals from CESAS). From 2013 through 2016 (the timeframe of the CESAS claims), United frequently sent CESAS denial letters providing blanket rejections of CESAS's appeals for multiple patients.[12] *See* SMF ¶ 81. Coupled with United's practice on claim payments and denials, the record on claim appeals gives rise to a triable issue of waiver and/or consent: United *never* consulted specific plans to see what they said about assignment, and the evidence shows

---

[12] These blanket denial letters include some of the patient/claims at issue in United's Motion.

that United recognized CESAS was the correct party to deal with when processing these claims –
even if no benefits were paid.

     **D.**     **Where United believes it has overpaid benefits, it seeks to recover such
payment from the provider, not the patient.**

United's waiver of anti-assignment provisions reaches its zenith in its standard practice of
recovering alleged overpayments directly from providers. In the real world, United deals almost
exclusively with providers in demanding and recovering overpayments. *See* SMF ¶¶ 89-90, 94-
97. This shows United's recognition that, despite what plan anti-assignment provisions might
say, once claim submission has occurred, the providers are the true benefit holders. Otherwise,
United would demand repayment from the patient, and seek to recover such overpayment from
the patient. Indeed, that is what some of its plans expressly require:

> **Right to Offset.** If We make a claim payment to You or on Your behalf in error
> or You owe Us any money, You must repay the amount You owe to Us. Except as
> otherwise required by law, if We owe You a payment for other claims received,
> We have the right to subtract any amount You owe Us from any payment We owe
> You.

*See* SMF ¶¶ 25, 28, 30, 32-34. United's overpayment-recovery conduct thus gives rise to at least
a triable issue of fact as to the enforceability of its anti-assignment provisions. Here, too,
United's current argument is a position conjured up for litigation that has no connection to its
real-world conduct. *See Peterson v. UnitedHealth Grp., Inc.*, 242 F. Supp. 3d 834, 842-43 (D.
Minn. 2017) ("It should be noted that, in looking carefully at the language of the plans … the
Court is doing something that United itself did not do[].… Only after getting sued did United
hunt through the plans for any language that might provide a *post hoc* justification for its
conduct.").

Indeed, purported overpayments are often "trued up" between United and the provider by
United offsetting benefit payouts across *multiple* patients. *See Premier Health Ctr., P.C. v.*

*UnitedHealth Grp.*, 292 F.R.D. 204, 211 (D.N.J. 2013) (explaining that if voluntary repayment by the provider is not made, United then offsets the overpayment from future amounts owing to the provider ). This fact is crucial, because such direct-from-provider recoupment necessarily reflects United's decision that the provider holds the benefits for both (1) the initial overpaid claim and (2) the subsequent claim that is set-off or recouped against.

Here's how the process works. Say that Patient Andrew goes to Provider Charles, United pays, and subsequently determines there was an overpayment. Later, Patient Baker goes to Provider Charles. United determines payment is due for Patient Baker's treatment, but it reduces payment to the provider by the amount overpaid on Patient Andrew's claim. If the patients were the benefit holders, it would make no sense to withhold a payment due to Patient Baker based on a debt tied to Patient Andrew. Instead, such actions demonstrate that United recognizes that the payment (and purported debt) both belong to Provider Charles.[13]

In this case, United's handling of claims for Patient S provides an especially clear example of United's conduct amounting to waiver. Patient S has two OBS claims implicated here – one denied for a date of service of February 2015, and one paid for a date of service in January 2015 (this latter payment is targeted by United's counterclaims). As explained in United's Motion, Patient S's plan with TD Securities contains an anti-assignment clause. *See* Motion at 8. United paid CESAS directly for Patient S's claim, thereby honoring the assignment. But meanwhile, United had demanded repayment from CESAS for other benefit payouts for Patients BJ and BE. When CESAS declined to repay, United simply reduced the benefits it paid on Patient S's January 2015 claim in order to recoup the alleged overpayments for Patients BJ

---

[13] Of course, when Patient Andrew and Baker have different plans, the practice of "cross-plan offsets" is flagrantly illegal because, regardless of the destination of the benefits, the source of the benefits is two distinct plans. *See generally Peterson*, 242 F. Supp. 3d at 834. But the fact that United even attempts to do this, in those instances where Patient Andrew and/or Baker's plans have anti-assignment clauses, shows United's systematic waiver of such clauses.

and BE. *See* SMF ¶¶ 98-105. Patient BJ's plan ████████████████████████████

████████████████ *See* SMF ¶ 51. This fact pattern is emblematic of United's general practice of

ignoring plan anti-assignment terms – and if United wants to deal directly with providers when

collecting money, it is only fair that providers should be allowed to sue as assignees.

* * *

Thus, at every step of the claim process – initial payment or denial; appeals; and in some

instances post-payment recoupment – United deals directly with providers (like CESAS) in

derogation of plan anti-assignment clauses. Numerous courts in this District have found waiver

and/or consent to assignment under these circumstances, as such conduct obviously evidences

United's voluntary and intentional relinquishment of a known right. "[The claim administrator's]

long-standing pattern and practice of direct payment to [providers] is sufficient to show its

consent to [providers'] assignments." *Neuroaxis Neurological Assoc., PC v. Cigna Healthcare of

N.Y., Inc.*, No. 11 Civ. 8517 BSJ AJP, 2012 WL 4840807, at *3 (S.D.N.Y. Oct. 4, 2012) (Jones,

J.). "Oxford is estopped from relying on the anti-assignment provision in light of Oxford's own

long-term pattern and practice of accepting and paying on [provider's] direct billing." *Biomed

Pharma., Inc. v. Oxford Health Plans (NY), Inc.*, No. 10 Civ. 7427 (JSR), 2011 WL 803097, at*5

(S.D.N.Y. Feb. 18, 2011) (Rakoff, J.). "If the Plan had intended to prevent all assignments, as

defendants claim, then it would not have preserved the discretion to pay [provider] directly."

*Protocare of Metro. N.Y., Inc.* 866 F. Supp. at 761-62.

To be sure, United can point to contrary authority in this District, such as *Merrick v.

UnitedHealth Grp., Inc.* But although that court rejected the waiver argument, it "acknowledged

that courts in this District have interpreted facts and language similar to that at issue here as

establishing consent, estoppel, and/or waiver." 175 F. Supp. 3d at 123 (citing *Neuroaxis*, *Biomed*,

16

and *Protocare*). And *Merrick* is distinguishable, as it was decided without the concrete record evidence presented here, including United's uniform, written policy and actual practice of waiving anti-assignment clauses.[14]

The rest of United's principally out-of-Circuit authority, *see* Motion at 15-17, is similarly inapposite because in none of those cases did the plaintiffs put forward a holistic and comprehensive outline of record evidence showing that the claims fiduciary routinely overrode its own anti-assignment provisions throughout its claim-processing operations. *See Eden Surg. Ctr. v. Cognizant Tech. Solns. Corp.*, 720 F. App'x 862, 863 (9th Cir. 2018) (unpublished, out-of-Circuit decision; estoppel and waiver discussion centered on single benefits claim); *Brand Tarzana Surg. Inst., Inc. v. Int'l Longshore and Warehouse Union-Pac. Mar. Ass'n Welfare Plan*, 706 F. App'x 442, 443-44 (9th Cir. 2017) (unpublished, out-of-Circuit decision; "[t]here is no evidence that the Plan or its vendors took action inconsistent with the anti-assignment provision"); *Am. Orthopedic*, 890 F.3d at 454 (case was disposed of on motion to dismiss, and focused on single benefit claim);  *Neuroaxis Neurosurg. Assoc., PC v. Costco Wholesale Co.*, 919 F. Supp. 2d 345 (S.D.N.Y. 2013) (motion-to-dismiss ruling focused on estoppel, not waiver, and deferred ruling on consent); *Adv. Orthopedics and Sports Medicine v. Blue Cross Blue Shield of Mass.*, Civil Action No. 14-7280 (FLW)(LHG), 2015 WL 4430488 (D.N.J. July 20, 2015) (motion-to-dismiss ruling focused on single benefit claim); *Mbody Minimally Invasive Surg., P.C. v. Empire Healthchoice HMO, Inc.*, No. 13-cv-6551 (TPG), 2014 WL 4058321, at *3 (S.D.N.Y. 2014) (motion-to-dismiss ruling on waiver predicated solely on "direct payments" argument).

---

[14] Indeed, the *Merrick* court found that, "[b]eyond direct payments," "United's communications with Plaintiffs requesting documentation and eventual reimbursement" presented a "closer question" as to waiver. 175 F. Supp. 3d at 123. As explained *supra* at 14-16, United's across-the-board, direct-from-provider recoupment practices cannot possibly be squared with its newfound reliance on plan anti-assignment clauses. It is not clear whether the *Merrick* court considered such evidence.

The record here precludes a grant of summary judgment: Plaintiffs have presented evidence that at all steps of the claims process, United doesn't bother to check plans for anti-assignment language; honors assignments on the face of claim forms submitted by out-of-network providers; and almost always deals directly with providers for processing claims. It does so for understandable business reasons: as United's counsel has explained, "plan participants, doctors, and *health plans generally find it much more convenient for the plan to pay the provider directly* for services rendered to the patient, rather than requiring the patient to pay the provider upfront and then to seek direct reimbursement from the plan." Ex. 6, Gregory F. Jacob, *Participant vs. Healthcare Provider: Who Holds the ERISA Rights?*, 23 No. 4 ERISA Litg. Rep. NL 4, at 1 (Nov. 2015) (*"Who Holds the ERISA Rights?"*) (emphasis added). And far from undercutting the case for waiver, these business reasons actually strengthen it.

The *only* time United cares about anti-assignment provisions is when it gets hauled into court. That is not how justice works, or at least, that is not how it should work. This Court should find that United's routine conduct adds up to waiver of anti-assignment provisions, or consent to those assignments, or at the least, find that there is a triable issue of fact on this score.

## III.  CESAS MAY SUE IN ITS CAPACITY AS AUTHORIZED REPRESENTATIVE OR ATTORNEY-IN-FACT FOR THE PATIENTS WHOSE CLAIMS ARE AT ISSUE.

For almost all the claims subject to the Motion, CESAS secured not only an assignment of benefits, but also the patient's designation of CESAS as his or her authorized representative and/or attorney-in-fact. *See* SMF ¶¶ 44-48; *see also* Ex. 1-1 at CESAS_00007864 (example of form, executed by patient, demanding that OBS facility fees be reimbursed and authorizing CESAS "to speak on [her] behalf to achieve resolution on this matter"). Earlier this year, the

18

Third Circuit explained in a case arising under ERISA how such designations are distinct from

assignment of benefits:

> [O]ur holding today that the anti-assignment clause is enforceable means that [the patient], as plan beneficiary, did not transfer the interest in his claim, but it does not mean that [the patient] cannot grant a valid power of attorney. To the contrary, because he retains ownership of his claim, [the patient], as principal, may confer on his agent the authority to assert that claim on his behalf, and the anti-assignment clause no more has power to strip Appellant of its ability to act as [the patient's] agent than it does to strip [the patient] of his own interest in his claim.

*Am. Orthopedic*, 890 F.3d at 455.

Plaintiffs recognize that the Court, in ruling on United's motion to dismiss, rejected this

argument with respect to Patients A and B. But the Court's determination was made on the

pleadings, without the benefit of record development, and – perhaps most important – without

the insight of the Third Circuit's compelling discussion in *American Orthopedic*. Although it is

true that ERISA "carefully enumerates the parties entitled to seek relief" under 29 U.S.C.

§ 1132(a), recognizing the power-of-attorney concept here does not "expand the congressionally-

created statutory list of those who may bring a cause of action." *See* Doc. 59 at 12 (describing the

Court's concern). *American Orthopedic* demonstrates that where a power of attorney is involved,

the action is still brought by the patient-principal. 890 F.3d at 455. "Indeed, the Insurers'

argument that anti-assignment clauses preclude principals from granting a power of attorney to

their agents not only lacks support; it also seems particularly ill-suited for the healthcare

context[]." *Id.*

Recognizing that ERISA authorized representatives may bring suit follows the same logic

– the claim being advanced is still that of the "participant" or "beneficiary" under § 1132(a),

simply brought through an agent. And the authorized-representative concept is as much a

creature of the ERISA statute as the language of ERISA's civil-remedies provision, because it

stems from the Department of Labor's mandate to promulgate claims procedures under 29

U.S.C. § 1133.  Indeed, if a benefits "claim" is indistinguishable from the right to vindicate that

claim in Court – as the Court suggested in its motion to dismiss ruling, Doc. 59 at 12[15] – then

§ 1133 necessarily gives authorized representatives the right to sue in the name of the patient.

"ERISA's central purpose is to protect beneficiaries of employee benefits plans," *Pension Ben.

Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv.

Mgmt., Inc.*, 712 F.3d 705, 715 (2d Cir. 2013), and recognizing beneficiaries' ability to bring suit

through a designee is fully consistent with – indeed, central to – that purpose.

The Court's prior decision was also made without the benefit of published statements by

United's counsel in this case directly *supporting* Plaintiffs' position. As Mr. Jacob explains:

> We pause to note that there is one other fairly common arrangement between
> providers and patients that might also fit within a "derivative standing"
> umbrella, but that does no violence to ERISA's text. Patients often designate
> providers (and sometimes even non-providers) to serve as their "authorized
> representatives" for purposes of pursuing their ERISA claims. With an authorized
> representative designation, the patient fully retains the legal right to the
> underlying plan benefit payment; nothing is assigned to the provider. *But the
> patient's authorized representative is permitted to pursue the ERISA claim on the
> patient's behalf, essentially acting as the patient's agent or attorney-in-fact.*

---

[15] The Court's earlier finding that the benefit claim is inextricable from the right to sue is fully consistent with Plaintiffs' authorized-representative theory. Again, the benefit claim still resides with the patient/beneficiary. But to be clear, and to preserve the issue on appeal, Plaintiffs respectfully disagree with the Court's ruling that there is no distinction between the "right to assign *benefits*" and "the right to assign a *cause of action*." Doc. 59, at 12 (emphasis in original). As United's Motion emphasizes, *see* Motion at 17, interpretation of anti-assignment provisions is an exercise in contract interpretation, and there must be "unambiguous" prohibition language, *see* Motion at 12. *See Encompass Office Solns.*, 2017 WL 3268034, at *12 ("Whether an anti-assignment clause voids or invalidates an assignment of benefits depends on the court's application of universally recognized canons of contract interpretation to the plain wording of the anti-assignment clause at issue.") (quotes and alterations omitted). None of the provisions cited by United speaks "unambiguously" to the assignment of the right to sue; instead, they focus exclusively on (a) "benefits or monies" or "right to reimbursement" or "right to collect money," that is due (b) "under this Contract" or "under this Certificate" or "under this Policy." *See* SMF ¶¶ 25-42. Even beyond *Lutheran Med. Ctr. of Omaha, Neb. v. Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan*, 25 F.3d 616 (8th Cir. 1994), cited by Plaintiffs in connection with the Motion to Dismiss, ample case law supports the distinction that Plaintiffs draw here. *See, e.g.*, *United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Teikoku Pharma USA, Inc.*, Case No. 14-md-02521-WHO, 2015 WL 4397396, at *6 (N.D. Cal. July 17, 2015) ("The DSAs' non-assignment clauses are limited to the assignment of duties and obligations under the DSAs themselves and do not include causes of action sounding in antitrust arising from those agreements.").

> The true litigant in an authorized representative situation is the patient, who continues to hold the underlying ERISA rights and unquestionably qualifies either as a plan participant or beneficiary within the meaning of Section 502. We do not think that a provider acting as a patient's authorized representative needs to establish standing in its own right at all, any more than an attorney bringing a lawsuit needs to establish any kind of personal standing independent of the client's. But we do suppose that provider authorized representatives might accurately be described as exercising some form of "derivative standing" in bringing such lawsuits, since the entire standing inquiry in such a case necessarily focuses on the patient rather on the provider that is actually appearing before the court.

Ex. 5, Gregory F. Jacob, *Provider "Standing" Wars Continue*, 24 No. 3 ERISA Litig. Rep. NL 4, at 4 (Sept. 2016) ("*Standing Wars*"), at 4 (emphasis added).

At the time this article was published, Mr. Jacob's firm was already counsel to United.[16] And yet, just five months later, Defendants' counsel took a diametrically opposite position in United's reply on its Motion to Dismiss, arguing that "nothing in the regulations permit an authorized representative to bring litigation once the administrative process is complete." Doc. 58 at 8; *see also id.* (suggesting the authorized-representative theory is indistinguishable from an assignment theory).[17] Whether as a legally-binding admission, or a matter of practical fairness, or simply a well-reasoned explanation of the law later endorsed by the Third Circuit in *American Orthopedic*, opposing counsel's full-throated endorsement of Plaintiffs' position dooms United's

---

[16] This article was published in September 2016. At that point, O'Melveny & Myers (which Mr. Jacob joined in 2012), had been retained by United as its counsel and agent to speak on matters in this lawsuit – including matters such as Plaintiffs' capacity to sue. *See* Docs. 14-16, 43 (notices of appearance of O'Melveny as Defendants' counsel). Mr. Jacob's online firm biography notes that he is an editor of the ERISA Litigation Reporter, "and a frequent speaker and writer on hot topics in ERISA litigation" (available at https://www.omm.com/professionals/gregory-f-jacob/).

[17] Contrary to Defendants' characterization in their reply on the Motion to Dismiss, Doc. 58 at 8, Plaintiffs' complaint *did* bring this lawsuit in the name of Plaintiffs' patients. The First Amended Complaint's caption stated that the provider plaintiffs were proceeding "both directly *and as the representative*" of the patients. Doc. 36 at 1 (emphasis added). The same language appears in the caption of the (Corrected) First Amended Complaint: it names CESAS "both directly and as the representative of PATIENTS C, D, E and F[]." Doc. 73 at 1.

argument that CESAS may not sue based on its status as the patients' designated authorized representative and/or attorney-in-fact.[18]

## IV.   UNITED'S MOTION IS NOT MATERIAL TO CESAS'S CLAIM FOR INJUNCTIVE OR DECLARATORY RELIEF, OR TO THE SCOPE OF THE PUTATIVE CLASS.

### A.   Class relief is unaffected by the Court's determination of whether these 18 plans have enforceable anti-assignment provisions.

Although the Motion is technically targeted towards a limited set of CESAS claims, United does not hide the fact that this Motion is an attempt to frame "upcoming class certification" proceedings. Mot. at 2. But the Court should be fully aware of the practical ramifications of the Motion vis-à-vis class certification: there are none. United owes a duty to *someone* to properly process claims for OBS facility fees, whether it be the provider or the patient (who will then pay the provider for services rendered), and CESAS can represent both.[19] In addition, CESAS is bringing a claim for injunctive and declaratory relief with respect to such duty, for itself and on behalf of a putative Rule 23(b)(2) class. United's Motion does not impact the claim for an injunction and a declaration of rights.

United does not assert – and it cannot assert, because not all plans have an anti-assignment provision – that CESAS may not rely on *any* of the 72 claims listed. *See* Motion 2 at

---

[18] The law-of-the-case doctrine is no bar to this Court addressing its prior ruling. "The law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). A court may revisit its prior decision where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.*

[19] Whatever United might say about the motivations behind its Motion, it really just wants to get *its* money out of the pot. *See* SMF ¶ 8 (unlike fully-insured plans, ASO plan payments are "supported by employer-funded bank accounts"). That is why it has focused on the fully-insured plans and their COCs. It is also why United has vigorously opposed Plaintiffs' efforts to discover information about those plans, despite United's conceded "homogeneity" as to those plans – an admission of commonality for purposes of class certification. *See* Motion at 2 n.3.

n.3 (stating "numerous" plans have anti-assignment provisions, but, notably, not all).[20] Where

CESAS has at least one valid assignment, it becomes an "assimilated member[] of the class" of

patients. *Cordes & Co. Fin. Servs., Inc.*, 502 F.3d at 101. The claims of CESAS, "premised as

they are on the harms allegedly suffered" by the patients, "fairly encompass the claims of the

class," and that is all that is required. *Id.* (quotes omitted).[21] As the Second Circuit held, "an

assignment of a class claim by a person who purports to be a class representative does not render

the claim less amenable to resolution as a class action, nor class action treatment less beneficial

to the litigants, after the transfer of the asserted cause or causes of action than before." *Id.* at 102.

Indeed, once CESAS holds at least a single validly-assigned claim, it *becomes* a

beneficiary – that much has been explained by United's counsel, Mr. Jacob:

> Judge Easterbrook himself said precisely that some 25 years ago in *Kennedy v. Conn. Gen. Life Ins. Co.*, holding that when a provider receives a valid assignment of a patient's contractual right to receive a benefit payment, "[t]hat makes [the provider] a 'beneficiary.'" … *Pennsylvania Chiropracti*c expressly reaffirmed Judge Easterbrook's earlier pronouncement concerning provider beneficiary status in *Kennedy*, stating that "when a 'participant' assigns to a medical provider the right to receive the participant's entitlement under the plan, this makes the provider a 'beneficiary' under § 1002(8)."

Ex. 5, *Standing Wars*, at 3 (full citations omitted).[22] *See also* Ex. 6, Jacob, *Who Holds the ERISA*

*Rights?*, at 4 ("The other possible rule that emerges from [*Rojas v. Cigna Health and Life Ins.*

*Co.*, 793 F.3d 253 (2d Cir. 2015)] is that providers *can* become ERISA beneficiaries, but *only* if

they validly acquire their patients' legal rights under the plan to the benefits in question.")

(emphases in original). Defendants have already recognized, in their prior motion to strike, that

---

[20] United does not challenge the validity of CESAS's assignments in the absence of an anti-assignment provision.

[21] United does not argue that the fully-insured plans are different from the self-funded plans in such a way that CESAS – even if it holds no fully-insured claims in the end – could not represent a class embracing such fully-insured plans.

[22] Again, this article was published in September 2016, after O'Melveny & Myers became United's counsel in this matter.

the class(es) at issue here can comprise both providers and patients. *See* Doc. 76 at 6 n.6 (noting

possibility that "provider *or patient* represents a class member's claim") (emphasis added).[23]

Moreover, even if certain CESAS claims are barred, once it demonstrates its capacity to

sue on at least one claim, the Court need not inquire about the capacity of absent class members.

Indeed, even Article III standing need not be shown beyond the named class representative. *See*

*Neale v. Volvo Cars of N.A., LLC*, 794 F.3d 353, 362 (3d Cir. 2015) ("[U]nnamed, putative class

members need not establish Article III standing. Instead, the 'cases or controversies' requirement

is satisfied so long as a class representative has standing."); *Lewis v. Casey*, 518 U.S. 343, 397

(1996) ("[T]he propriety of awarding classwide relief … does not require a demonstration that

some or all of the unnamed class could themselves satisfy the standing requirements for named

plaintiffs.") (Souter, J., concurring in part, dissenting in part). This is especially true where

injunctive and declarative relief may be sought under Rule 23(b)(2). *See Neale*, 794 F.3d at 367

(noting that (b)(2) certification is appropriate even where "defendant's action or inaction has

taken effect or is threatened only as to one or a few members of the class, provided it is based on

*grounds* which have general application to the class") (quote omitted, emphasis in original).

CESAS may stand on however many or however few validly-assigned claims it has, in order to

get this Court to adjudicate the propriety of United's uniform refusal to pay OBS facility fees.

---

[23] In its motion to strike, United suggested that the possibility of assignment raises individualized inquiries across the class as to who holds the claim – patient or provider – and then suggested such circumstance precludes class certification. *See* Doc. 76 at 6 n.6. United is wrong, for reasons that can be explained more fully at the class-certification stage should United press the argument. For now, it is enough to point out that under United's view of the world, no class could ever be certified: no matter the context (ERISA or otherwise), there is always the possibility that an absent class member has assigned his or her claim to an "outside" party. Thus, United's view cannot be correct. Instead, the proper focus is on the *named* plaintiff's capacity to sue, and again, United does not argue that CESAS is wholly devoid of such capacity.

**B.**   **United has not moved with respect to Patient BE, who is covered under a COC, and therefore resolution of this Motion cannot possibly alter CESAS's ability to sue under fully-insured plans.**

As United has explained, fully-insured plans are approved by state regulators and are represented through COCs. Even where CESAS's own ability to sue vis-à-vis fully-insured plans is at issue, United's Motion fails in its apparent purpose of removing all COCs from the case, Motion at 2, because United has not moved with respect to all fully-insured patients implicated in CESAS's claims. Patient BE is covered under the fully-insured plan ███████████████████, and yet is not part of United's Motion.

The omission is not merely technical. For example, Patient BE's plan does not contain an anti-assignment provision. It contains a ████████████████████████████████████ ████████████████████████████. SMF ¶ 49. As for language even conceivably touching on assignments, ████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████ *Id.* Plainly, United cannot remove all COCs from this action if there is at least one COC that does not prohibit assignments, and the Motion fails to address Patient BE's plan.

## CONCLUSION

For the reasons set forth above, United's motion for partial summary judgment should be denied or, in the alternative, deferred until Plaintiffs have had the opportunity to take the discovery specified in the accompanying Rule 56(d) Declaration, and then to supplement the record.

Dated: New York, New York
      July 26, 2018

Respectfully submitted,


/s/ *Anant Kumar*
D. Brian Hufford
Jason S. Cowart
Anant Kumar
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor
New York, NY  10022
212.704.9600
917.261.5864 (fax)
dbhufford@zuckerman.com
jcowart@zuckerman.com
akumar@zuckerman.com


Cyril V. Smith (*pro hac vice*)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD  21202
410.332.0444
410.659.0436 (fax)
csmith@zuckerman.com


John W. Leardi
BUTTACI LEARDI & WERNER, LLC
103 Carnegie Center, Suite 323
Princeton, NJ  08540
609.799.5150
609.799.5180 (fax)
jwleardi@buttacilaw.com


*Counsel for Plaintiffs and the Putative Class*