# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE MEDICAL SOCIETY OF THE STATE OF NEW YORK, on behalf of its members; SOCIETY OF NEW YORK OFFICE BASED SURGERY FACILITIES, on behalf of its members; COLUMBIA EAST SIDE SURGERY, P.C., both directly and as the representative of PATIENTS C, D, E, and F; and on behalf of all others similarly situated, | Civil Action No. 1:16-cv-05265-JPO **(Oral Argument Requested)** |
| Plaintiffs, | |
| v. | |
| UNITEDHEALTH GROUP, INC., UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY, UNITED HEALTHCARE SERVICE LLC, OPTUM GROUP, LLC and OPTUM, INC., and OXFORD HEALTH PLANS LLC, | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

ANTON METLITSKY
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

BRIAN D. BOYLE (*pro hac vice*)
GREGORY F. JACOB (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendants*

April 12, 2019

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 4

I.  PLAINTIFFS HAVE NOT ESTABLISHED ALL OF THE REQUIREMENTS
    OF RULE 23(a) ................................................................................................... 6

    A.  Plaintiffs Are Neither Typical Nor Adequate Class Representatives ................. 6

    B.  Plaintiffs Have Not Established Commonality .................................................. 17

        1.  All Of Plaintiffs' Claims Fail Because Class Member Standing
            Necessarily Turns On Individualized Inquiries ..................................... 18

        2.  Plaintiffs' Entitlement To Benefits Turns on Plan-Specific
            Inquiries ................................................................................................ 25

        3.  Plaintiffs' Claim For Injunctive Relief Likewise Lacks
            Commonality .......................................................................................... 37

II. PLAINTIFFS HAVE NOT ESTABLISHED ANY OF THE ELEMENTS OF
    RULE 23(b) ....................................................................................................... 39

    A.  Plaintiffs Are Not Entitled To Certification Under Rule 23(b)(1) ..................... 39

    B.  Plaintiffs Are Not Entitled To Certification Under Rule 23(b)(2) ..................... 42

    C.  Plaintiffs Are Not Entitled To Certification Under Rule 23(b)(3) ..................... 43

    D.  Plaintiffs Cannot Rely On Issue Certification Under Rule 23(c)(4) To
        Evade Defects In Their Class Certification Motion ........................................... 47

CONCLUSION ........................................................................................................... 48

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    269 F.R.D. 252 (S.D.N.Y. 2010) ............................................................. 47

*Adkins v. Morgan Stanley*,
    307 F.R.D. 119 (S.D.N.Y. 2015) ............................................................. 45

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
    821 F.3d 352 (2d Cir. 2016)................................................................... 19

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).............................................................. 4, 6, 40

*AvuTox, LLC v. Cigna Health & Life Ins. Co.*,
    2017 WL 6062257 (E.D.N.C. Dec. 7, 2017) .......................................... 22

*Ballas v. Anthem Blue Cross Life & Health Ins. Co.*,
    2013 WL 12119569 (C.D. Cal. Apr. 29, 2013) ..................................... 41

*Bano v. Union Carbide Corp.*,
    361 F.3d 696 (2d Cir. 2004).................................................................. 16

*Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y.*
    *Mellon Corp.*,
    287 F.R.D. 216 (S.D.N.Y. 2012) ............................................................ 46

*Beck v. Maximus, Inc.*,
    457 F.3d 291 (3d Cir. 2006).................................................................. 7

*Biomed Pharmaceuticals, Inc. v. Oxford Health Plans (N.Y.), Inc.*,
    831 F. Supp. 2d 651 (S.D.N.Y. 2011)..................................................... 34

*Black Grievance Comm. v. Phila. Elec. Co.*,
    79 F.R.D. 98 (E.D. Pa. 1978)................................................................. 15

*Boesel v. Chase Manhattan Bank, N.A.*,
    62 F. Supp. 2d 1015 (W.D.N.Y. 2009) ................................................... 31

*Bowe Bell + Howell Co. v. Immco Emps.' Ass'n*,
    2005 WL 1139645 (N.D. Ill. May 11, 2005) ......................................... 41

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ................................................................ 25

*Brown v. Kelly*,
    609 F.3d 467 (2d Cir. 2010).............................................................. 6, 7

*Castano v. Am. Tobacco Co*,
    84 F.3d 734 (5th Cir. 1996) .................................................................. 46

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Chorosevic v. MetLife Choices*,
  2007 WL 2159475 (E.D. Mo. July 26, 2007) ......................................... 27

*Cigna Corp. v. Amara*,
  563 U.S. 421 (2011) ............................................................................ 33

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................... 5

*Cordova v. Bache & Co.*,
  321 F. Supp. 600 (S.D.N.Y. 1970) ...................................................... 15

*Coriale v. Xerox Corp.*,
  775 F. Supp. 2d 583 (W.D.N.Y. 2011) ................................................ 17

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ................................................................ 25

*Diaz v. Elecs. Boutique of Am., Inc.*,
  2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ....................................... 6

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
  631 F.3d 42 (2d Cir. 2011) .................................................................. 22

*Durakovic v. Building Service 32 BJ Pension Fund*,
  609 F.3d 133 (2d Cir. 2010) ........................................................... 34, 35

*Egelhoff v. Egelhoff ex. rel. Breiner*,
  532 U.S. 141 (2001) ............................................................................ 26

*Eisen v. Carlisle & Jacquelin*,
  391 F.2d 555 (2d Cir. 1968) ................................................................ 40

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ............................................................................ 45

*Falcon v. Philips Elecs. N. Am. Corp.*,
  304 F. App'x 896 (2d Cir. 2008) ....................................................... 6, 7

*Felix v. Northstar Location Servs., LLC*,
  290 F.R.D. 397 (W.D.N.Y. 2013) ....................................................... 42

*Franco v. Conn. Gen. Life Ins. Co.*,
  289 F.R.D. 121 (D.N.J. 2013) ................................................... 26, 27, 44

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
  270 F.R.D. 150 (S.D.N.Y. 2010) ........................................................ 13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990).......................................................................... 7, 11, 14

*Gibbs Props. Corp. v. CIGNA Corp.*,
  196 F.R.D. 430 (M.D. Fla. 2000)............................................................................ 46

*Guerrero v. FJC Sec. Servs. Inc.*,
  423 F. App'x 14 (2d Cir. 2011) ............................................................................. 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)................................................................................................ 5

*Hardt v. Reliance Standard Life Insurance Co.*,
  560 U.S. 242 (2010).............................................................................................. 46

*Harriss v. Pan Am. World Airways, Inc.*,
  74 F.R.D. 24 (N.D. Cal. 1977)............................................................................... 15

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
  571 U.S. 99  (2013)............................................................................................... 26

*Hoffman v. Empire Blue Cross & Blue Shield*,
  1999 WL 782518 (S.D.N.Y. Sept. 30, 1999)......................................................... 26

*In re IPO Secs. Litig.*,
  471 F.3d 24 (2d Cir. 2006)...................................................................................... 5

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002) ........................................................................... 47

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  827 F.3d 223 (2d Cir. 2016).................................................................................... 6

*In re Rail Freight Fuel Surcharge Antitrust Litig. MDL No. 1869*,
  725 F.3d 244 (D.C. Cir. 2013) .............................................................................. 23

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013)................................................................................... 25

*In re WellPoint, Inc., Out-of-Network "UCR" Rates Litig.*,
  2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) ............................................... passim

*Iron Workers Local 12 Pension Fund by Eggleston v. Standard Steel Fabricators, Inc.*,
  2018 WL 4554493 (N.D.N.Y. Sept. 21, 2018) ..................................................... 10

*Jamie S. v. Milwaukee Pub. Sch.*,
  668 F.3d 481 (7th Cir. 2012) ................................................................................ 43

### TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Johnson v. Nextel Comm'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015)................................................................... 44

*Kartman v. State Farm Mut. Auto. Ins.Co.*,
    634 F.3d 883 (7th Cir. 2011) ................................................................ 42

*Katz v. Comprehensive Plan of Grp. Ins.*,
    197 F.3d 1084 (11th Cir. 1999) ............................................................ 17

*Kinek v. Paramount Commc'ns, Inc.*,
    22 F.3d 503 (2d Cir. 1994)................................................................... 31

*Laurent v. PricewaterhouseCoopers LLP*,
    2017 WL 3142067 (S.D.N.Y. July 24, 2017) ................................. 33, 34

*Lipstein v. UnitedHealth Grp.*,
    296 F.R.D. 279 (D.N.J. 2013)............................................ 27, 39, 42, 44

*London v. Wal–Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir.2003) ............................................................ 13

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)................................................................... 6

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)................................................................. 48

*Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*,
    2017 WL 4023350 (S.D.N.Y. Sept. 11, 2017)...................................... 11

*Miles v. Principal Life Ins. Co.*,
    720 F.3d 472 (2d Cir. 2013)................................................................. 43

*Molski v. Gleich,*
    318 F.3d 937 (9th Cir. 2003) ................................................................. 6

*Monaco v. Stone,*
    2002 WL 32984617 (E.D.N.Y. Dec. 20, 2002) .................................... 15

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)............................................................... 44

*N. E. Med. Servs., Inc. v. State of California Dep't of Health*,
    670 F. App'x 615 (9th Cir. 2016)......................................................... 10

*Norwalk CORE v. Norwalk Redevelopment Agency,*
    395 F.2d 920 (2d Cir. 1968)................................................................. 15

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*O'Shaughnessy v. Cypress Media, L.L.C.*,
2015 WL 4197789 (W.D. Mo. July 13, 2015)........................................................... 23

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
286 F.R.D. 355 (N.D. Ill. 2012) .............................................. 19, 20, 21, 44

*Pender v. Bank of Am. Corp.*,
788 F.3d 354 (4th Cir. 2015) ................................................................. 34

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
654 F.3d 618 (6th Cir. 2011) ................................................................. 41

*Rambarran v. Dynamic Airways, LLC*,
2015 WL 4523222 (S.D.N.Y. July 27, 2015) ........................................... 5

*Roadhouse v. Las Vegas Metro. Police Dep't*,
290 F.R.D. 535 (D. Nev. 2013)........................................................ 46

*Robertson v. Nat'l Basketball Ass'n*,
556 F.2d 682 (2d Cir. 1977)........................................................ 43

*Robinson v. Metro–N. Commuter R.R.*,
267 F.3d 147 (2d Cir. 2001)........................................................ 48

*Rochow v. Life Ins. Co. of N. Am.*,
780 F.3d 364 (6th Cir. 2015) ................................................................. 17

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018)........................................ 48

*Rueckert v. Sheet Metal Workers' Int'l Ass'n*,
77 F.R.D. 409 (S.D.N.Y. 1977) ........................................................ 12

*Ruiz v. Citibank, N.A.*,
93 F. Supp. 3d 279 (S.D.N.Y. 2015)........................................................ 17

*Sosna v. Iowa*,
419 U.S. 393 (1975)........................................................ 14

*Spagnola v. Chubb Corp.*,
264 F.R.D. 76 (S.D.N.Y. 2010) ........................................................ 25, 45

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015)........................................................ 42, 46

*Tex. Gen. Hosp., LP v. United Healthcare Servs., Inc.*,
2016 WL 3541828 (N.D. Tex. June 28, 2016) ........................................ 22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Tomassini v. FCA US LLC,*
    326 F.R.D. 375 (N.D.N.Y. 2018) ................................................................. 24, 25

*Touro Infirmary v. Am. Mar. Officer,*
    2007 WL 4181506 (E.D. La. Nov. 21, 2007) ............................................. 22

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) ................................................................................. 44

*U.S. Airways, Inc. v. McCutchen,*
    569 U.S. 88 (2013) ....................................................................................... 26

*Value Mktg., Inc. v. RR Donnelley & Sons Co.,*
    2016 WL 7494282 (S.D. Iowa Mar. 8, 2016) ........................................... 10

*Varity Corp. v. Howe,*
    516 U.S. 489 (1996) ..................................................................................... 17

*Vaught v. Scottsdale Healthcare Corp. Health Plan,*
    546 F.3d 620 (9th Cir. 2008) ...................................................................... 31

*Vaughter v. E. Air Lines, Inc.,*
    817 F. 2d 685 (11th Cir. 1987) ................................................................... 41

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ............................................................................. passim

*Welch v. Unum Life Ins. Co. of Am.,*
    382 F.3d 1078 (10th Cir. 2004) .................................................................. 31

*Wu v. Pearson Educ., Inc.,*
    277 F.R.D. 255 (S.D.N.Y. 2011) ............................................................... 42

**STATUTES**

29 C.F.R. § 2560.503-1(b)(5) ........................................................................... 39

29 U.S.C. § 1132(a)(1) ..................................................................................... 19

29 U.S.C. § 1132(a)(1)(B) ........................................................................... 17, 26

29 U.S.C. § 1132(a)(3) ................................................................................ 17, 19

29 U.S.C. § 1132(g)(1) ..................................................................................... 46

29 U.S.C. § 1185d ............................................................................................ 33

42 U.S.C. § 300gg-5 ......................................................................................... 33

NY Pub. Health § 230-d(h) ............................................................................. 30

vii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**OTHER AUTHORITIES**

6 Am. Jur. 2d Assignments § 113 ................................................. 21

**RULES**

Fed. R. Civ. P. 23(a) ................................................................ 14

Fed. R. Civ. P. 23(a)(4) .......................................................... 14, 16

Fed. R. Civ. P. 23(b)(1) .......................................................... 40, 41

Fed. R. Civ. P. 23(b)(2) ................................................................ 42

Fed. R. Civ. P. 23(b)(3) .......................................................... 43, 45

**TREATISES**

1 *McLaughlin on Class Actions* § 5:52 (15th ed. 2018) ....................... 44, 46

3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.07[1] (2d ed. 1987) ......................... 7

7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1764 (2d ed. 1986) ................................................................ 7

Charles A. Wright, et al., 7AA *Fed. Prac. & Proc.* § 1773 (3d ed. 2018) ................ 40, 41, 42, 46

# INTRODUCTION

This Court should deny Plaintiffs'[1] motion for class certification because discovery has confirmed that classwide adjudication here is impossible.  To certify a class, Plaintiffs must satisfy each of the Rule 23(a) requirements, yet Plaintiffs fail at least three of them—typicality, adequacy, and commonality.  And even if Plaintiffs could meet that threshold, they would fail to satisfy any of the Rule 23(b) requirements.  That is so for numerous reasons.

*First*, Plaintiffs have failed to name a typical or adequate class representative.  Two of the three named plaintiffs—MSSNY and NYOBS—are associations who are not even members of the proposed class, and thus are precluded from representing the class as a matter of law.  And while CES is a class member, it is wholly atypical and inadequate as a class representative because its long-standing pattern of fraud—including but not limited to recurrently billing United[2] for services that its patients say it never provided, deliberately misrepresenting the nature of the venue using coding that Plaintiffs' expert admits was inaccurate, and repeatedly changing the name of its location in an effort to evade United's fraud detection systems— subjects it to defenses (and potential counterclaims[3]) not relevant to any other class members.  Those defenses are well-supported in the discovery record, and will require protracted litigation

---

[1] Plaintiffs are Dr. Darrick Antell ("Antell"), in the name of his business, Columbia East Side Surgery, P.C. ("CES") and two associations, the Medical Society of the State of New York ("MSSNY") and Society of New York Office Based Surgery Facilities ("NYOBS").  MSSNY and NYOBS (the "Associational Plaintiffs") join the claim for declaratory and injunctive relief only.

[2] Defendants are UnitedHealth Group Incorporated, United HealthCare Services, Inc., UnitedHealthcare Insurance Company, UnitedHealthcare Service LLC, Optum Group, LLC, Optum, Inc., and Oxford Health Plans LLC (collectively, "United").

[3] This Court dismissed United's fraud-based counterclaims against CES on ERISA preemption grounds, but granted United leave to amend.  Dkt. 153 at 13.

on issues having nothing to do with the putative class's claims.  There is no reason to allow a class to go forward with such a patently inadequate representative.

*Second*, Plaintiffs have failed to satisfy Rule 23(a)'s commonality requirement.  Most obviously, there is a clear lack of common answers to the principal questions in this matter—(a) whether a class member has standing to sue, and (b) whether the various plans that would be placed at issue by class members' claims provide facility fee benefits for surgeries performed in office-based surgical settings (OBS facility fees).  Discovery, as well as this Court's recent ruling on partial summary judgment, confirm that these questions can be determined only on a class-member-specific, plan-specific basis, and that classwide adjudication of those questions is impossible.

The standing question alone is sufficient to eliminate any possibility of commonality because, generally, only plan participants and beneficiaries can bring an ERISA benefits claim.  Here, Plaintiffs are not plan participants but a single healthcare provider (CES) and two associations in which CES's owner claims membership but that have never themselves provided any surgical services, received any assignments, or filed any claims.[4]  Plaintiffs argue that CES has standing because its patients assigned it their ERISA claims.  But as this Court recently reaffirmed in its partial summary judgment order, the validity of assignments varies from patient to patient depending on the specific language of the patient's plan.  Moreover, healthcare providers use a wide variety of forms to obtain authorization from patients to bill their insurance, many of which on their face do not purport to convey the patients' ERISA rights to the provider.  For these and other reasons, it would be unworkable to determine the standing of *every class*

---

[4] Dr. Antell is the current president of NYOBS and his practice (Columbia East Side) is a member of NYOBS and MSSNY.  Compl. ¶ 17.

*member* on a classwide basis.  This by itself precludes class certification.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

It would be equally unworkable to determine, on a classwide basis, United's coverage obligations—i.e., whether each class member's plan requires reimbursement of OBS facility fees.  That question also turns on a member-specific, plan-specific review.  As with the standing question, the discovery record confirms that Plaintiffs' coverage claims cannot be determined on a common basis.

Nor is there any way to adjudicate Plaintiffs' claim for injunctive relief on a classwide basis.  Plaintiffs' claim for injunctive relief rests on the assertion that United adopted a blanket policy that uniformly rejects OBS facility fee coverage under all United-administered plans without regard to the plans' actual language.  But Plaintiffs plainly mischaracterize United's claim adjudication process, and ignore the ways that United considers and applies the language of each individual plan.  Approximately 80-85% of claims filed with United are auto-adjudicated—a process that is tailored to rely on plan-specific benefits information that United loads into its systems through an onboarding process that includes consideration and interpretation of plan-specific terms.  The discovery record shows that at the time of onboarding, every United-administered plan undergoes a thorough vetting process to ensure that its terms are consistent with United's standard claim adjudication practices and default plan term interpretations, which includes a detailed process specifically dedicated to flagging and addressing any nonstandard plan terms that may be inconsistent.  United's process for onboarding plans and loading their terms into its systems fully satisfies ERISA's requirement that claim adjudication take plan terms into account.  While it is theoretically possible a mistake could be made during the onboarding process in interpreting and loading a plan's surgical benefit

provisions (there is notably no evidence that mistakes were made with respect to any of the 45 plans presently at issue), any such failings would be specific to individual plans, and could be addressed only through an individualized examination of each plan's specific language and accompanying onboarding process.

*Third*, even if Plaintiffs could satisfy all of the requirements of Rule 23(a), they satisfy none of the requirements of Rule 23(b). Plaintiffs do not satisfy Rule 23(b)(1) or 23(b)(2) for several reasons, including that classwide injunctive relief is improper because material variations in plan language cause United to owe *differing* legal obligations to different class members. Plaintiffs also fail to satisfy Rule 23(b)(3) for at least two reasons. For one thing, individual issues predominate over common ones. Plaintiffs cannot even satisfy the much more lenient commonality requirement; they certainly come nowhere close to showing that common questions predominate over the individualized, plan-specific inquiries that will necessarily dominate these proceedings. Moreover, and relatedly, Plaintiffs cannot show that a class action is superior to individualized proceedings, particularly in light of the plan- and participant-specific questions that the Court will have to answer before awarding each class member relief.

For these reasons, and for those explained in more detail below, the motion for class certification should be denied.

## ARGUMENT

Plaintiffs bear the burden of establishing that their action satisfies all four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy— and one of the three subsections of Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). As the Supreme Court has emphasized, district courts must rigorously analyze plaintiffs' compliance with these criteria: "certification is proper only if the trial court is

satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied." *Dukes*, 564 U.S. at 350-51 (quotations omitted); *see Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013).  District courts, moreover, must apply this analysis in two related respects.

First, the court must ensure that the plaintiffs have carried their burden of satisfying Rule 23 through competent proof.  Because "Rule 23 does not set forth a mere pleading standard," *Dukes*, 564 U.S. at 350, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *see also, e.g.*, *Comcast*, 569 U.S. at 33-34; *In re IPO Secs. Litig.*, 471 F.3d 24, 33 n.3 (2d Cir. 2006).  "Courts in this Circuit have [thus] consistently denied class certification motions where the party seeking certification failed to present sufficient evidence as to one or more Rule 23 elements." *Rambarran v. Dynamic Airways, LLC*, 2015 WL 4523222, at *4 (S.D.N.Y. July 27, 2015) (collecting cases).

Second and relatedly, the district court must consider all relevant evidence and resolve key questions concerning class certification at the class certification stage—i.e., *before* a class is certified.  *Comcast*, 569 U.S. at 33.  "A district judge," the Second Circuit has instructed, "is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit."  *In re IPO*, 471 F.3d at 42.  Questions concerning the suitability of class treatment, in other words, cannot be deferred.

As detailed below, Plaintiffs have not established all of the requirements of Rule 23(a) or any of the requirements of Rule 23(b).  Plaintiffs' motion for class certification should accordingly be denied.

I.      **PLAINTIFFS HAVE NOT ESTABLISHED ALL OF THE REQUIREMENTS OF RULE 23(a)**

A.      **Plaintiffs Are Neither Typical Nor Adequate Class Representatives**

The named Plaintiffs do not satisfy Rule 23(a)'s typicality and adequacy requirements. Under Rule 23(a)(3), the "claims or defenses of the class representatives" must "be typical of the claims or defenses of the class members." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010); *accord Diaz v. Elecs. Boutique of Am., Inc.*, 2005 WL 2654270, at *7 (W.D.N.Y. Oct. 17, 2005) ("[C]laims of the class representative [must] be typical of those of the class, [i.e.,] when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.") (quotation omitted).

Under Rule 23(a)(4), a class representative likewise must "fairly and adequately protect the interests of the class." *Falcon v. Philips Elecs. N. Am. Corp.*, 304 F. App'x 896, 897 (2d Cir. 2008) (quotation omitted).  Adequate representation depends upon "an absence of antagonism [and] a sharing of interests between representatives and absentees." *Molski v. Gleich,* 318 F.3d 937, 955 (9th Cir. 2003), *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.,* 603 F.3d 571 (9th Cir. 2010).  The adequacy inquiry, like other Rule 23(a) requirements, is intended to ensure "the efficiency and fairness of class certification," *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997), with a particular focus on "uncover[ing] conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.  "To assure vigorous prosecution, courts consider whether the class representative has adequate incentive to pursue the class's claim, and whether some difference between the class representative and some class members might undermine that incentive." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016).

Under both of these Rule 23(a) requirements, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). "Regardless of whether the issue is framed in terms of the typicality of the representative's claims, Rule 23(a)(3), or the adequacy of its representation, Rule 23(a)(4), there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (citing 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1764, at 259-60 (2d ed. 1986) (typicality); 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.07[1], at 23-192 (2d ed. 1987) (adequacy of representation); *accord Falcon*, 304 F. App'x at 897; *see also Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006) ("A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."). Accordingly, where "the action involves a host of legal and factual issues unique to [the named plaintiffs] that are likely to distract from their representation of the class," certification is improper. *Brown*, 609 F.3d at 479.

Here, none of the named Plaintiffs is an adequate or typical representative plaintiff.

**CES**. Plaintiff CES is an OBS practice in the state of New York that is owned and operated by Antell. Dkt. No. 73 ¶ 13. Antell—a former plaintiff in this action who was dismissed by order of this Court, but who continues to litigate the action through CES—has owned and operated at least five different OBS practices during the last fifteen years that use different Tax Identification Numbers (TINs) but that are all actually located at the exact same physical space.[5] As payers like United have flagged Antell's various OBS practices for fraud, he

---

[5] Ex. A; Ex. B; Ex. C.

has simply renamed them, changed their TINs, and continued his scheme seeking to extract

unwarranted facility fees through a widespread pattern of deception and inaccurate coding.

United alleged this fraudulent scheme in its First Amended Answer and Counterclaims, Dkt. 96,

and has since uncovered evidence of the following:

- *Use of deceptive coding*.  CES repeatedly submitted claims for reimbursement to United in which CES knowingly and falsely represented it was licensed to operate as an Ambulatory Surgery Center ("ASC")—notwithstanding that CES is not and never has been licensed to operate as an ASC.  Specifically, CES falsely used ASC billing codes to induce United to reimburse claims that CES knew United would have denied had CES accurately represented that it is in fact an OBS practice.[6]  Indeed, one of the other named Plaintiffs, MSSNY, advised Antell that billing for facility fees this way when CES is in fact an OBS practice was likely fraudulent.[7]

- *Ignoring repeated statements by state and federal regulators that CES had no facility fee entitlement*.  Numerous government officials told Antell that his billing was improper or that he had no actionable claims:

    o New York Department of Finance:  "[I]t sounds like you are trying to bill as an ambulatory facility . . .  I remember you from like 2005 or -6 and we had this same discussion."  Ex. J at 15; "You are billing as a standalone licensed facility of which you are not, based on your own admission."  Ex. K at 3; "[H]ealth plans will process these claims in accordance with their internal policies and must be submitted in the format required by the health plan . . . This issue has been discussed at length on numerous occasions . . . I will not respond to this matter again."  Ex. L.

    o New York Department of Health:  "Licensure under Article 28 almost always ensures payment of a 'facility fee' but accreditation of an OBS practice does not."  Ex. M.

---

[6] For example, CES often submitted facility fee claims to United using Form CMS-1500, "Health Insurance Claim Form," which requires the provider to input the place of service into field 24.B.  For many claims submitted to United, CES input code "24" for Ambulatory Surgery Center into this field.  *E.g.*, Ex. D at 6569.  Likewise, CES has also submitted facility fee claims to United using Form CMS-1450, also known as the UB-04 claim form, which includes field 42 for "Revenue Code."  For many claims submitted to United, CES input code "0490" into this field for Ambulatory Surgical Care.  *E.g.*, Ex. E; Ex. F at 9376.  The UB-04 claim form also includes a field for "Type of Bill."  For many claims submitted to United, CES input code "831" for Ambulatory Surgery Center into this field.  *E.g.*, Ex. G at 6341; Ex. H at 0163.

[7] *See* Ex. I.

- o Department of Labor: "New York law does not mandate insurance companies to reimburse for services provided in an office space facility . . . insurers are free to establish their own guidelines." Ex. N at 17.

- *Fraudulently billing for services not provided to patients.* CES evidently had a practice of secretly recording its phone calls with patients, many of whom called in to complain that CES billed United for services that the patients never received:

  - o Patient AC: "[W]hat I had done and what [CES] put in for are two different things." Ex. O at 7.

  - o Husband of Patient AU: "I just wanted to make sure we're clear there was no surgery paid, or no surgery done, and that, off the record, I think $14,000 for what he did is ridiculous, but this is your business model, I suppose. Because he literally just kind of like felt the nose and then put some plastic on it and that was it." Ex. P at 6.

  - o Patient BJ: Complaining that CES billed for "removal of growth from neck, chest," when the patient in fact "did not have anything removed from my chest or neck." Ex. Q at 7.

- *Deliberately inflating bills beyond any reasonable bounds.* Antell made clear CES's cavalier attitude toward billing at its 30(b)(6) deposition, testifying that "I can bill for the oxygen and the air if I want to." Ex. R ("Antell I Dep.") at 326:14-327:6. Unsurprising, CES received numerous calls from patients concerned that, although they personally owed CES nothing more, CES was vastly overcharging United:[8]

  - o Patient AB: "[I]t's also becoming kind of an ethical issue; $80,000 worth of charges for—you know—a 45-minute procedure, it just seems wrong to me." Ex. U at 3.

  - o Patient M: "I was in the office for an hour? An hour and fifteen minutes? And I know it was, you know, four different procedures. But we're talking about over $200,000 of billing." Ex. V at 3.

---

[8] The medical community itself has taken note of Antell's fraudulent billing practices. In June 2015, the American Society of Plastic Surgeons (ASPS) Ethics Committee filed an "exorbitant billing" complaint against Antell after he billed around $185,000 for stitching up a 3/4 inch nose wound. Ex. S. A friend of Antell's whose support he solicited demurred, telling Antell that the bill failed to pass "the smell test." Ex. T. Antell claimed at his deposition on January 18, 2019—the last day of the first discovery period—that he later received a letter closing the case without a finding of wrongdoing. He has since refused numerous requests to produce the alleged closing letter, however, on the asserted grounds that United's request is untimely.

- o   Patient AC:  "I'm sure that my procedure and everything that I had done could never have cost $60,000"—which is what CES billed United.  Ex. W at 5.

- *Knowingly employing a billing service for the purpose of inflating bills:*  Plaintiffs' expert testified that it "would be improper for a billing service to add to a physician's charges."  Ex. X at 19:20-21:7.  Yet CES knowingly employed billing services, including ANMM, that routinely and fraudulently inflated CES's charges.  Ex. R Antell I Dep. at 301:8-14 ("Q: . . . [W]as ANMM actually changing the amounts that Jordan or Emily put on the bills? A: Well, in that case part of the contract was that we would agree to use the amounts that ANMM had assigned to each code."); Antell to another doctor: "I can tell you [ANMM's bills are] high by most people's standards." Ex. Y; Kravitz to Patient AB ". . . [The bill from ANMM] it's going to be like shockingly high . . . . because they know they are not going to get paid on the facilities so they want to send the highest numbers they can negotiate if they do wind up getting paid." Ex. U at 7-8; Kravitz to Patient AC: "It's called the American National Medical Management.  They handle just the facility side and their fee schedule is rather high because they bill knowing that the insurance company is not going to come close to paying that."  Ex. W at 4; Kravitz to Patient M: "American National Medical Management -- their fee schedule is very high. I think their rationale now they bill really high, because they know the insurance company will not pay."  Ex. V at 3.

Due to these and other fraudulent practices, United made substantial unwarranted payments to CES.  United likewise incurred substantial costs investigating and litigating CES's illicit activities.

In light of CES's fraudulent conduct, United has asserted an "unclean hands" affirmative defense against CES's claims, *see Iron Workers Local 12 Pension Fund by Eggleston v. Standard Steel Fabricators, Inc.*, 2018 WL 4554493, at *11 (N.D.N.Y. Sept. 21, 2018) (recognizing "the doctrine of unclean hands" as a defense in ERISA actions), and further maintains that any recovery on CES's part should be subject to an equitable setoff against payments CES fraudulently induced from United.  *See, e.g.*, *N. E. Med. Servs., Inc. v. State of California Dep't of Health*, 670 F. App'x 615, 616 (9th Cir. 2016) ("act[ing] unfairly" through improper billing to "reap a windfall" "bars equitable and declaratory relief"); *Value Mktg., Inc. v. RR Donnelley & Sons Co.*, 2016 WL 7494282, at *7 (S.D. Iowa Mar. 8, 2016) ("fact question . . . with regard to the propriety of [defendant's] billing practices" precluded judgment

10

in defendant's favor).  United has also filed counter-claims against CES for: (i) fraudulent reimbursement; (ii) unjust enrichment; and (iii) violation of the New York Deceptive Trade Practices Act.  Dkt. 96.  This Court recently held that these counter-claims are preempted under ERISA because they require plan interpretation, but also granted United leave to amend its complaint.  Dkt. 153 at 13.  United's unclean hands defense is not subject to preemption.

Thus, as a result of its fraudulent billing practices, CES faces unique, difficult, and potentially dispositive defenses (and, potentially, counter-claims) that are fatal to CES's ability to serve as either a typical or adequate class representative.  Those affirmative defenses and potential counterclaims are particular to CES—the other members of the proposed class did not participate in CES's fraudulent scheme (although on information and belief, some other OBS providers employed fraudulent schemes of their own).  Indeed, if CES's expansive class definition is accepted, some of the very patients who complained about CES's overbilling would become members of the class CES seeks to represent.  The impact of these defenses and counter-claims is not academic—each could lead to significant motion practice and consume significant attention at trial, distorting the course of this litigation.  There is no sound reason to handicap the claims of other class members simply because of CES's misconduct.

Given the significant "danger that absent class members will suffer if their representative"—here, CES—"is preoccupied with defenses unique to it," *Gary Plastic,* 903 F.2d at 180, CES is neither a typical nor adequate class representative, and continued class proceedings are inconsistent with Rule 23(a).[9]

---

[9] If CES is found to be an atypical or inadequate class representative, Plaintiffs' request for a damages class under Rule 23(b)(3) must necessarily fail.  As the court correctly recognized in ruling on United's Motion to Dismiss, the remaining named Plaintiffs—MSSNY and NYOBS—have "emphasize[d] that they seek only injunctive and declaratory relief."  *Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*, 2017 WL 4023350, at *7 (S.D.N.Y. Sept. 11, 2017).

**NYOBS**.  NYOBS, for its part, is so closely intertwined with CES and Antell that it too is an improper class representative.  *See Rueckert v. Sheet Metal Workers' Int'l Ass'n*, 77 F.R.D. 409, 410 (S.D.N.Y. 1977) (co-representative of proposed class who is "merely an alter ego" of improper class representative must be rejected).

NYOBS is an association of physicians, dentists, and podiatrists that have New York State OBS practices.  But NYOBS is not just any association—it was co-founded by Antell, who currently serves as its president.  Ex. Z.  In fact, Antell created NYOBS for the purpose of bringing this lawsuit—specifically to "enable discovery of [United's] records and business methods at [United's] expense" and to "bring [United] to the [bargaining] table."  Ex. AA. Antell also represented NYOBS in national healthcare billing organization meetings (Ex. AB), and has used his influence with NYOBS as a bargaining chip when seeking a better contract in negotiations with United.  Ex. AC.

Moreover, NYOBS's leadership has demonstrated a willingness to sell out the OBS practices it claims to represent for their own benefit.  While NYOBS claims to represent all New York OBS practices, it in fact places the interests of its officers over those of other practices.  For example, NYOBS was involved in an effort to secure state legislation requiring reimbursement of OBS facility fees.  But NYOBS's leadership told their lobbyist that they were perfectly willing to enter into a settlement with the major healthcare payors whereby they would agree to drop NYOBS's legislative efforts in exchange for future payment of the NYOBS leadership's facility fee submissions.  Ex. AD at 3 ("[I]t would make a whole lot more sense if Blue Cross, as well as the other ones, settled with us, because if they pay all of the officers, then there's going to be an -- and all the people who were charter members -- there's going to be a lot less impetus to get stuff done through hearings and other things.").  The discovery record further shows that "[a]

12

lot of members [felt] like the leadership took advantage of the members' funds and gave themselves exclusive benefits." Ex. AE.  A plaintiff who has already demonstrated an unwillingness or inability to represent even its own membership obviously is not an adequate class representative. *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 159-60 (S.D.N.Y. 2010) (considering, *inter alia*, "whether the representative has potential conflicts or antagonistic interests with the rest of the class, and whether the representative has sufficient moral character to represent the class"); *accord London v. Wal–Mart Stores, Inc.,* 340 F.3d 1246, 1254 (11th Cir. 2003) (named plaintiff must "possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative").

In addition, NYOBS and its leadership have long been associated with fraudulent activity.  To start, NYOBS's leadership knowingly hired fraudulent billing services.  For example, one doctor who was the Chair of NYOBS hired ANMM—the same company that Antell used to submit his facility fee claims—for the express purpose of inflating his bills: "ANMM bills most cases at significantly greater amounts than the company with whom we have been speaking.  It therefore appears likely that we will use ANMM."   Ex. AF.  After Antell became embroiled in an ethics controversy for his exorbitantly high billing rates, the NYOBS Chair wrote that "ANMM need[ed] to come up with data defending their billing"—which ANMM notably never was able to do.  Ex. AG.  NYOBS likewise sought to induce Tracy Walters, a billing claims specialist, to "test bill" United for NYOBS (i.e., to submit bills to United containing particular combinations of billing codes, without regard to accuracy, to test whether that combination of codes would result in payment) and to infiltrate United by getting hired at United and to advise NYOBS "from the inside"—in other words, to spy.  *See* Ex. AH; Ex. AI.  Even more alarming, NYOBS discussed bribing a New York State Senator to pressure

payors to settle. Ex. AD at 4 ("Well, if [the Senator] can get Blue Cross to pay, don't you -- I would think that we would be able to get a significant number of people to contribute to his campaign.").

NYOBS's close relationship with Antell and CES—as well as NYOBS's longstanding association with fraudulent activity—make it unfit to represent the proposed class. The "danger that absent class members will suffer" because NYOBS, like CES, "is preoccupied with defenses unique to it" is far too significant. *Gary Plastic*, 903 F.2d at 180.

***NYOBS and MSSNY***. As associational plaintiffs, NYOBS and MSSNY should also be rejected as class representatives for three additional reasons.

*First*, they fall outside the proposed class as defined by Plaintiffs. The proposed class includes only:

> Any United Plan member, or member's valid assignee, whose claim for facility fees for services rendered by an out-of-network OBS provider accredited under Section 230-d was denied, where such claim was (1) submitted under a Plan governed by ERISA; (2) denied during the applicable statute of limitations; and (3) denied on the basis that the OBS provider was not certified under Article 28 of the New York Public Health Law.

NYOBS and MSSNY assert standing only in their associational capacity; they are not United Plan members, nor are they the valid assignees of any United Plan member. They are thus not members of the proposed class.

This alone disqualifies them as class representatives. By its plain terms, Rule 23 authorizes "[o]ne or more *members of a class*" to bring suit on behalf of a class, and requires (among other things) that "the *claims* . . . of the representative parties" be typical of those belonging to the class. Fed. R. Civ. P. 23(a), (a)(4) (emphasis added). Thus, as the Supreme Court has explained, "[a] litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Sosna v. Iowa*, 419 U.S.

14

393, 403 (1975).  Plaintiffs cite a case from the Eastern District Court of New York stating that organizations with associational standing may serve as class representative.  Dkt. 143 ("Br.") at 21 (citing *Monaco v. Stone*, 2002 WL 32984617 (E.D.N.Y. Dec. 20, 2002)).  But that decision (and any like it) conflicts directly with the plain text of Rule 23 and the Supreme Court's instruction in *Sosna* that a class representative must be a member of the class it seeks to represent.[10]  That limitation is dispositive of NYOBS and MSSNY.

*Second*, even if associational plaintiffs that are not class members can serve as class representatives, they can do so only by virtue of their "associational standing," and only when "the underlying purpose of the organization is to represent the interests of the class."  *Monaco*, 2002 WL 32984617, at *38.  As the Second Circuit has explained, Rule 23 precludes associations from being class representatives unless the association's "raison d'etre is to represent the interests of that class."  *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 937 (2d Cir. 1968).[11]  NYOBS and MSSNY are associations that represent healthcare providers, and assert associational standing based on the fact that healthcare providers are their

---

[10] *See, e.g., Cordova v. Bache & Co.*, 321 F. Supp. 600, 604 (S.D.N.Y. 1970) ("[P]laintiff cannot sue on behalf of a class of representatives, since only a member of the class is permitted under Rule 23 to bring such a suit."); *Black Grievance Comm. v. Phila. Elec. Co.,* 79 F.R.D. 98, 110-11 n.13 (E.D. Pa. 1978) ("The Committee is not an adequate representative . . . because the Committee Per se is not a member of either class and, therefore, has not suffered the same alleged injury as the individual class members . . . . An association cannot be an adequate representative of the class unless it meets the requirements of Fed. R. Civ. P. 23(a)(4)."); *Harriss v. Pan Am. World Airways, Inc.,* 74 F.R.D. 24, 40 n. 10 (N.D. Cal. 1977) ("Although members of the class may be members of the association or other organization, it is itself not a member of the class and would therefore normally be barred as a class plaintiff unless perhaps its raison d'etre is to represent the class.").

[11] *Norwalk* predates *Sosna*.  To the extent this Court feels bound by *Norwalk*, United preserves the argument that non-class-member associations cannot serve as class representatives under *Sosna* and Rule 23's text.  But that argument in the end makes no difference because even under *Norwalk*, the associations here are not typical or adequate class representatives for the reasons explained in the text.

members.  But the class these associations seek to represent is not limited to healthcare

providers—the class also includes patients who are participants in United plans but who have not

assigned their claims to a provider.  And NYOBS and MSSNY do not have associational

standing by virtue of patient members, nor do they purport to represent the interests of patients.

Thus, these associations fail the very test that Plaintiffs assert establishes their typicality and

adequacy as class representatives.  Where NYOBS's raison d'etre is to assist its provider-leaders

in securing facility fee reimbursements, and MSSNY's raison d'etre is to "promot[e] a favorable

environment for the practice of medicine through advocacy, education and professional

community for New York State physicians," (Ex. AJ), neither can "fairly and adequately protect

the interests of [a] class" that includes patients.  Fed. R. Civ. P. 23(a)(4).

Indeed, MSSNY's raison d'etre not only has nothing to do with patients, but it does not

even have anything to do with OBS providers.  As just explained, MSSNY purports to promote

the practice of medicine generally, not OBS providers specifically, which provides an additional

reason that MSSNY cannot adequately represent the class.

*Third*, because Plaintiffs' claims will require examination of individual benefit denial

determinations and the terms of the individual plans, *see* Part I.B, *infra*, neither of the two

associational Plaintiffs can be typical or adequate class representatives.  To resolve both the

question whether individual class members have standing and whether patients were entitled to

benefits under the terms of their plan for outpatient surgery facility-coverage, the Court will need

to examine the disparate language in each individual ERISA plan.  *See id*.  Associational

plaintiffs are particularly inappropriate class representatives where liability will turn on

individualized evidence.  *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004)

(organization cannot assert claims of injunctive relief on behalf of its members "where the fact

and extent of the injury that gives rise to the claims for injunctive relief would require individualized proof") (quotations omitted).  NYOBS and MSSNY thus cannot serve as class representatives.

### B.    Plaintiffs Have Not Established Commonality

Nor have Plaintiffs satisfied Rule 23(a)'s commonality requirement.  To satisfy commonality, a plaintiff must show that the class's claims "depend upon a common contention" and that this common contention is "of such a nature that it is capable of classwide resolution." *Dukes*, 564 U.S. at 350.  It is not enough for a plaintiff merely to raise a common question; rather, the relevant inquiry is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. (quotations omitted).  While it may be true that a "single common question of law or fact" can satisfy commonality, Br. 14, "that common question must materially advance the litigation." *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 289 (S.D.N.Y. 2015).  It is thus crucial at the outset to define the scope of the class's claims, because questions, no matter how "common," that do not speak to the core elements of those claims cannot materially advance the litigation.

Plaintiffs' claims for benefits and injunctive relief under 29 U.S.C. § 1132(a)(1)(B)[12] lack commonality, for three reasons.

---

[12] Plaintiffs assert an "alternative" claim under 29 U.S.C. § 1132(a)(3), ERISA's "catchall" provision.  Br. 13.  That claim necessarily fails, however, because § 1132(a)(1)(B) provides an adequate remedy.  "[R]elief under § [1132](a)(3) is contingent on a showing that the claimant could not avail himself or herself of an adequate remedy pursuant to § [1132](a)(1)(B)." *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372-73 (6th Cir. 2015) (en banc).  And, as the Supreme Court explained in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), because § 1132(a)(1)(B) "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims," *id*. at 512, Plaintiffs' remedies under § 1132(a)(1)(B) are adequate, *even if* Plaintiffs fail to prove their claims under § 1132(a)(B), *Katz v. Comprehensive Plan of Grp. Ins.*, 197 F.3d 1084, 1089 (11th Cir. 1999) ("availability of an adequate remedy under the law for *Varity* purposes does not mean, nor does it guarantee, an adjudication in one's favor"); *see Rochow*, 780 F.3d at 372-73 (same); *see also,*

*First*, only "a participant or beneficiary of an ERISA-covered benefits plan" has standing to bring a § 1132(a)(1)(B) claim, *Guerrero v. FJC Sec. Servs. Inc.*, 423 F. App'x 14, 16 (2d Cir. 2011), yet CES and many class members are not plan participants but providers who say they have standing because they have been validly assigned their plan-participant patients' claims. But whether there has been an assignment, and whether that assignment is valid, must be determined on a claim-by-claim basis under the terms of each particular plan and each particular class member's assignment (or lack thereof)—a circumstance that precludes classwide adjudication. *Second*, Plaintiffs' claims for benefits likewise lack commonality because the question whether any particular class member is entitled to benefits turns on the terms of that class member's plan, and the varying plan terms at issue in this case necessarily mean that benefits determinations will require substantial individualized inquiry. *Third*, Plaintiffs' claims for injunctive relief lack commonality because their request for an injunction requiring United to consult plan terms when adjudicating facility fee claims will necessarily break down into a claim-by-claim or plan-by-plan inquiry because the evidence establishes that United *does* consult plan terms for all plans during its ERISA-compliant onboarding process, and that any failings in that process would necessarily be particular to specific onboardings and particular plans.

1. <u>All Of Plaintiffs' Claims Fail Because Class Member Standing Necessarily Turns On Individualized Inquiries</u>

Plaintiffs' claims falter out of the gate because the Court will have to undertake an inherently individualized inquiry just to determine whether each putative class member has a

---

*e.g.*, *Coriale v. Xerox Corp.*, 775 F. Supp. 2d 583, 598 (W.D.N.Y. 2011) ("[T]he general rule is that if a plaintiff can pursue a claim for benefits under Section 1132(a)(1)(B), he cannot also seek equitable relief on a breach-of-fiduciary-duty claim under 1132(a)(3), even in the alternative.") (quotations and alterations omitted), *aff'd* 490 F. App'x 387 (2d Cir. 2012).  Plaintiffs do not even argue, moreover, that they satisfy commonality with respect to their "alternative" § 1132(a)(3) claims.

valid cause of action.  This is because ERISA limits standing (i.e., grants a cause of action) to

plan participants, beneficiaries, and fiduciaries.  29 U.S.C. §§ 1132(a)(1), (3).  CES seeks to take

advantage of a "narrow exception" to that rule, which permits healthcare providers to bring

claims if they have a valid assignment from a patient.  *Am. Psychiatric Ass'n v. Anthem Health*

*Plans, Inc.*, 821 F.3d 352, 361 (2d Cir. 2016).  But as the Court has repeatedly recognized—

including in its recent order granting United partial summary judgment—whether a provider can

pursue an ERISA benefits claim depends on the existence of a valid and enforceable assignment.

*See* Dkt. 153 at 14-25; Dkt. 59 at 11.

This gives rise to not one, but two inherently individualized inquiries.  First, the Court

will have to undertake a member-specific, plan-specific review to determine whether a plan

permits assignments and if so, its permissible scope.  And second, for those plans that allow

assignment, the Court will have to determine whether a valid assignment in fact exists.  Either

inquiry alone would suffice to foreclose certification.  *See, e.g.*, *Pa. Chiropractic Ass'n v. Blue*

*Cross Blue Shield Ass'n*, 286 F.R.D. 355, 374 (N.D. Ill. 2012) (denying certification where "the

proposed class claims would entail examination of individualized issues regarding the existence

and validity of assignments" under ERISA plans).

This Court need look no further than its recent decision granting partial summary

judgment to see why.  CES alleged that United wrongly denied coverage for OBS facility fees as

to 72 claims for 66 different patients, and attempted to bring all those claims on its own behalf

based on purported assignments from its patients.  Dkt. 153 at 6.  United argued that it was

entitled to summary judgment as to 20 of those claims—but not all of them—because those 20

claims were based on 19 different plans that contained anti-assignment provisions (only fully

insured plans were addressed in the partial summary judgment motion, although many of the

19

self-funded plans at issue among CES's claims also contain such clauses; those plans are

addressed in United's concurrently filed summary judgment motion).  United's April 12, 2019

Motion for Summary Judgment (forthcoming, hereinafter "United MSJ") at 16-17; *see also* Dkt.

153 at 6-7.  This Court agreed.  The Court concluded that "the anti-assignment provisions in the

plans at issue, on their own, would unambiguously bar assignment," Dkt. 153 at 16, and that

CES's arguments that United waived reliance on those anti-assignment provisions failed on the

undisputed facts, *id.* at 17-25.  As this analysis makes plain, "[t]he existence and meaning of

anti-assignment language in plans is an issue that must be determined on" an individualized

basis.  *Pa. Chiropractic Ass'n*, 286 F.R.D. at 374.

When the question whether these anti-assignment provisions precluded class certification

was last before the Court, it held that United's motion to strike the class allegations was

"premature" because (among other things) discovery would "shed light on the number of claims

that are potentially subject to assignment and the likely difficulty (or ease) of excluding

individuals who lack standing to sue."  Dkt. 87 at 4.  Discovery has confirmed that this issue is

pervasive and that it will be impossible to screen out putative class members who lack standing

in a manner consistent with the class mechanism.  More than half of the plans at issue—29 in

all—prohibit assignment absent United's consent, and anti-assignment language is present in

both United's Fully-Insured (18 plans) and ASO Plans (11 plans).  *See* Dkt. 153; United MSJ at

Part II.   Indeed, roughly half of *CES's claims alone* are precluded based on anti-assignment

provisions.  And because the Court rejected CES's argument that it could recover despite the

existence of these clauses because of the way United generally bills providers and adjudicates

claims, Dkt. 153 at 16-25, class members who sought to overcome anti-assignment provisions

based on arguments about United's conduct would be required to do so on a claim-by-claim

basis.  These claim- and plan-specific inquiries magnified on a classwide basis would obviously be unworkable.

Moreover, even as to the plans that allow assignment, the Court will be required to ensure that there is an actual, valid assignment of benefits as to each of the class's *ten-thousand-plus* claims for benefits to resolve the threshold question of standing.  In particular, the Court will need to assess—on an individualized basis, through careful review of the available evidence— whether any assignment of benefits took place.  Those claim-by-claim determinations would be entirely unmanageable in a class context.  For example, in *Pennsylvania Chiropractic v. Blue Cross Blue Shield Association*, a similar case filed by the same plaintiffs' counsel against a different health care payor, two named plaintiff providers (both of whom also have a history of filing claims with United),  acknowledged that they could not locate supporting patient-signed forms for numerous claims they had submitted for payment, *see* 286 F.R.D. 355, 373 (N.D. Ill. 2012) (One provider "could not find about twenty assignments from [his] patients," and the other "did not know whether each of her patients signed an assignment of benefits or was asked to do so"), and one provider admitted under oath that with respect to forms he could not find, "those patients likely had never executed an assignment."  *Id.*; *see also Integrated Orthopedics, Inc. v. UnitedHealth Grp.*, ECF No. 356, Memorandum of Law In Support of United's Motion for Class Decertification Under Fed. R. Civ. P. 23(c)(1)(C) (D.N.J. Aug. 31, 2015) (arguing that class should be decertified due to provider's inability to locate 14% of assignment forms).

The Court will likewise need to determine—on an individualized basis—whether any patient-signed forms that can actually be located qualify as valid assignments.  A valid assignment of benefits irrevocably transfers to a provider the assigning patient's contractual legal right to the benefits assigned.  *See, e.g.*, 6 Am. Jur. 2d Assignments § 113 ("In an assignment,

there is a complete divestment of all rights from the assignor and a vesting of those rights in the

assignee."); *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011)

("[A]n assignee stands in the shoes of its assignor and takes subject to those liabilities of its

assignor that were in existence prior to the assignment.").  Valid assignments stand in sharp

contrast to "direction of payment" forms, which authorize the insurer to route the patient's

benefit payment directly to the provider but do not transfer the patient's legal rights under the

plan.  *See Touro Infirmary v. Am. Mar. Officer*, 2007 WL 4181506, at *6 (E.D. La. Nov. 21,

2007) ("[T]he Assignment of Benefits clause . . . is not a full assignment of benefits.  Rather, the

clause simply authorizes direct payment to [the provider] and makes the patient responsible for

any charges not paid by the patient's health plan.").  A provider cannot sue under ERISA if the

relevant patient-signed form merely authorizes payment to the provider but does not clearly

establish that the insured assigned his legal right to plan benefits to the provider.  *See AvuTox,*

*LLC v. Cigna Health & Life Ins. Co.*, 2017 WL 6062257, at *3 (E.D.N.C. Dec. 7, 2017) ("In

order for an assignment under ERISA to be valid, it must be express.  The language of the

consent/insurance release relied on by plaintiff as the assignment of benefits is more properly

construed as a payment authorization, and this Court agrees with those courts that have held that

a payment authorization, without more, is not an assignment of benefits for purposes of

ERISA."); *Tex. Gen. Hosp., LP v. United Healthcare Servs., Inc.*, 2016 WL 3541828, at *7 (N.D.

Tex. June 28, 2016) ("Many cases have held that a health care provider who receives an

assignment from an ERISA plan beneficiary can achieve derivative standing.  However, the

claim being asserted must have been expressly assigned to the party asserting it.").

     Here, each separate ERISA claim is associated with a separate patient and a separate

form furnished by the provider.  The need to carefully review the language of the individual form

associated with each claim to determine whether a valid assignment of benefits occurred—assigning the patient's legal right to plan benefits to the provider, rather than merely directing payment to the provider—further defeats commonality under Rule 23(a).  *See O'Shaughnessy v. Cypress Media, L.L.C.*, 2015 WL 4197789, at \*9 (W.D. Mo. July 13, 2015) ("The obstacle to class certification here is that this is not a case where a single form contract was used throughout the class.  Cypress used multiple forms which are not materially similar, a fact which makes it difficult for common issues of fact to predominate.").

In an attempt to avoid these intractable problems, Plaintiffs have attempted to define the class to include more than just providers like CES—the class includes "[a]ny United Plan member, or member's valid assignee."  Br. 13.  But this overbroad class definition does nothing to obviate the need to undertake threshold individualized inquiries just to determine class membership.  If anything, it makes matters worse: the Court will have to undertake different but still individualized inquiries for each putative class member depending on whether that class member is a provider or an individual patient.  For providers, as discussed above, the Court must separately confirm the existence of a valid assignment for each claim.  And for individual plan members seeking to assert their own claims, the Court will need to conduct the opposite inquiry: It must ensure that the claim has *not* been assigned to a provider.  Either way, the Court will have to evaluate on a class-member-by-class-member basis whether a claim has been assigned and, for providers, whether that assignment is permitted under the terms of the plan.

But that is not the only reason why including patients in the class definition undermines commonality.  Many (if not all) of Dr. Antell's patients have not suffered an injury.  *See, e.g.*, *Dukes*, 564 U.S. at 350 (commonality requires that the class members have suffered the "same injury"); *cf. In re Rail Freight Fuel Surcharge Antitrust Litig. MDL No. 1869*, 725 F.3d 244, 252

(D.C. Cir. 2013) (under predominance requirement, holding that plaintiffs must show "through common evidence, that all class members were in fact injured"); *Tomassini v. FCA US LLC*, 326 F.R.D. 375, 388-89 (N.D.N.Y. 2018) (similar).  According to CES's Chief Claims Coordinator, Jordan Kravitz, CES routinely releases patients from all responsibility to pay claims denied by United,  promising that CES "would not come back after the surgery if, for whatever reason the insurance company did not pay . . . and hold [patients] responsible for that."  Ex. AK; Ex. AL ("Regardless of what the insurance company pays or does not pay, you do not owe any more to Dr. Antell or the facility."); Ex. AM ("Please rest assured that you do not owe anything further. Even if your explanation of benefits says that you owe the provider any amount not covered, this is not the case and can be disregarded."); Ex. AK ("We would not come back after the surgery if, for whatever reason the insurance company did not pay. . . and hold you responsible for that. You understand?  We're not going to come back that you owe us more and *we'd never do that with anybody and we're not going to start with you*.  You can rest assured that that won't happen.") (emphasis added); Ex. AN "Antell II Dep." at 182-185.  United's coverage denials for OBS facility fees thus did not harm CES patients because they already received all the surgical services from CES for which they contracted, and have no stake in CES receiving any further benefit payment from United because they owe CES nothing.

It is unclear exactly how widespread CES's policy was because Antell gave inconsistent testimony asserting that CES does not uniformly release patients from responsibility for facility fee bills that insurers refuse to pay.  *See, e.g.*, Ex. AN Antell II Dep. at 7-10; Ex. R Antell I Dep. at 263:17-264:1, 264:11-16.  But whether the policy is uniform or occasional in the end makes no difference.  If CES did have a uniform policy releasing patients from their obligations, then at a minimum the class definition would need to be narrowed to exclude all such individual plan

members because none (or at least no CES patient) would have suffered an injury.  *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("The class must . . . be defined in such a way that anyone within it would have standing."); *Tomassini*, 326 F.R.D. at 386 ("Where a plaintiff's class definition includes a significant number of individuals who do not have standing, a court must deny the motion for class certification.").  On the other hand, if CES's policy was occasional Plaintiffs would still fail commonality since the Court would have to conduct yet another patient-by-patient inquiry—including as to patients of other providers who may have had similar policies—to determine whether each patient class member was injured by the denial of benefits.  These types of varied, individualized inquiries are, again, antithetical to class action litigation.

### 2.      *Plaintiffs' Entitlement To Benefits Turns on Plan-Specific Inquiries*

As with standing, the key liability question—whether patients were entitled to benefits under the terms of their plans—cannot be determined on a classwide basis, because each class member's benefits claim turns on disparate language in each individual ERISA plan.

As numerous courts have recognized, breach of contract claims can be amenable to class treatment "only where they are subject to generalized proof."  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98 (S.D.N.Y. 2010), *aff'd* 531 F. App'x 93 (2d Cir. 2013); *see, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998).  The critical question in any breach of contract class action is whether the language governing each contract is materially identical, because "courts properly refuse to certify breach of contract class actions where the claims require examination of individual contract language."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 (2d Cir. 2013).

This is especially true in ERISA benefits class actions.  ERISA benefits claims are functionally breach-of-contract actions, and ERISA is emphatic that plan participants can recover only those benefits that were due to them under the terms of the plan.  *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) (authorizing a plan participant to bring suit "'to recover benefits due to him *under the terms of his plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits *under the terms of the plan*'") (quoting 29 U.S.C. § 1132(a)(1)(B)); *Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121, 135 (D.N.J. 2013), *aff'd*, 647 F. App'x 76 (3d Cir. 2016) ("The critical liability questions presented by the ERISA claims depend on plan language.  In other words, resolution of the ERISA claims requires an examination of what ONET benefits a plan entitled a participant or beneficiary to receive."); *Hoffman v. Empire Blue Cross & Blue Shield*, 1999 WL 782518, at *4 (S.D.N.Y. Sept. 30, 1999) ("plaintiff's ability to state claims under [] ERISA depends upon showing that the relevant plans covered the services that plaintiff provided").  Indeed, the Supreme Court repeatedly has emphasized that liability in an ERISA benefits action depends on the terms of the plan.  *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013) ("The plan, in short, is at the center of ERISA."); *Heimeshoff*, 571 U.S. at 108 ("This focus on the written terms of the plan is the linchpin" of ERISA); *Egelhoff v. Egelhoff ex. rel. Breiner*, 532 U.S. 141, 150 (2001) (noting "ERISA's requirements that plans be administered, and benefits be paid, in accordance with plan documents").  Plaintiffs themselves recognize this fundamental point.  *See* Br. 17 ("whether a service is covered or not turns on the benefits provided under the written Plan"); Ex. X at 266-67 (Plaintiffs' expert agreed that United would not be required to pay benefits "if the member benefit contract didn't require it"); Ex. AN Antell II Dep. at 14:22 (whether United covers

facility charges "depend[s] on the plan"); *see also* Ex. AO at 11 (Court's question to Plaintiffs: "But for you to win, you still have to show a violation of the plan, right?").[13]

Courts thus routinely refuse to certify ERISA class actions where the plan language governing a participant's entitlement to benefits varies. *See, e.g.*, *In re WellPoint, Inc., Out-of-Network "UCR" Rates Litig.*, 2014 WL 6888549, at *4-7 (C.D. Cal. Sept. 3, 2014) (commonality not satisfied because the court could not "determine what UCR obligations WellPoint had under the terms of its various plans without analyzing the specific terms of those plans"); *Franco*, 289 F.R.D. at 135-36 (noting "[t]he critical liability questions presented by the ERISA claims depend on plan language," and holding that class could not be certified because there was no evidence "that the critical UCR provision was uniform"); *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 290 (D.N.J. 2013) (holding plaintiffs failed "to establish the Rule 23(a) prerequisite of commonality for these claims, given the variations in the plans"); *Chorosevic v. MetLife Choices*, 2007 WL 2159475, at *8 (E.D. Mo. July 26, 2007).

This case is no different.  The Court will have no choice but to examine individual contract language because whether each class member is entitled to coverage for OBS facility

---

[13] Consistent with the inherently contractual nature of ERISA benefit claims, statements from the New York State Insurance Department and Department of Health support the proposition that OBS facility fee coverage is a contract question, necessitating individualized determinations. Indeed, each department has opined that while the Medicare and Medicaid programs categorically preclude payment of separate facility fees for "office based" procedures, OBS practice facility fees are a matter of negotiation between the practice and insurance provider.  *See* Ex. AP Ops. Gen. Counsel N.Y. Ins. Dept. No. 08–10–06 (Oct. 16, 2008) (stating that the New York "Insurance Law does not require an insurer to pay a claim for a 'facility fee' for surgery performed in a physician's office.  The payment of any such fee is subject to the terms and conditions of the insurance policy and agreement, if any, between the physician and the insurer.").  *See also* Ex. AQ *Non-Hospital Surgery in New York: Ambulatory Surgery Centers and Office-Based Surgery Background*, N.Y. Dep't of Health (July 17, 2013) (stating "payment for OBS services is a matter between the practice and the payers to negotiate").

fees depends on whether the plan under which that class member seeks benefits covers OBS facility fees.  And as discovery has shown—and as explained in more detail in United's accompanying summary judgment motion—the plans employ different language as to facility-fee coverage, which makes adjudicating United's coverage obligations on a classwide basis impossible.  United MSJ at Part IV.

For example, many of the patients' plans limit facility fees to state-licensed facilities, and thus expressly do not cover fees for OBS practices, which are not licensed.  Plans for Patients AC, AG, AJ, BK, BM, and BN cover professional fees for outpatient surgery performed in facilities and physicians' offices, but their outpatient surgical facility fee benefit provisions are explicitly restricted to Article 28-licensed facilities.[14]  Specifically, those plans cover the "Ambulatory Surgical Center Facility Fee" (including "services and supplies provided by the Center the day the surgery is performed") and "Outpatient Hospital Surgery Facility Charge," but do not include coverage provisions for office-based surgery facility fees.  *E.g.*, Dkt. 144-02 at MSSNY-UHG-0013635, 13639, 13677 (Patient AC).  CES is obviously not an "Outpatient Hospital," so it could be entitled to facility fees only if it was an "Ambulatory Surgical Center." And the plans define "Ambulatory Surgical Center" as a "Facility currently licensed by the appropriate state regulatory agency for the provision of surgical and related medical services on an outpatient basis;" and "Facility," in turn, as a provider "certified under Article 28 of the New York Public Health Law (or other comparable state law, if applicable)."  *E.g. id.* at 13654,

---

[14] While these plans have been dismissed because their anti-assignment provisions "unambiguously bar assignment," Dkt. 153 at 16, their surgical facility fee benefit provisions are nonetheless representative of the kind of language the Court would encounter in adjudicating United's coverage obligations on a classwide basis.  These plans thus remain illustrative of the need for plan-by-plan interpretive inquiries.  The plan-by-plan analysis of the 49 remaining claims in United's accompanying Motion for Summary Judgment further confirms the impossibility of classwide adjudication.  *See* United MSJ at Part IV.

13655.  Because CES and other OBS facilities are not licensed by the State or governed by Article 28, they cannot be Ambulatory Surgical Centers, and they are thus not covered under these plans.

In contrast, other plans provide coverage for facility fees "received on an outpatient basis at a Hospital or Alternate Facility."  *E.g.*, Dkt. 144-02 at MSSNY-UHG-00118048 (Patient AQ).  OBS practices like CES obviously are not hospitals, so the question will be whether they count as an Alternate Facility within the meaning of these plans.  There is a strong argument that they do not, or at least that United reasonably so concluded.  For one thing, these plans define Alternate Facility as a "health care facility that is not a Hospital, or a facility that is attached to a Hospital" and that provides (among other things) "[p]re-scheduled surgical services."  *E.g.*, *id.* at MSSNY-UHG-00118094.  But an OBS practice is not a "facility" under either New York law or CMS reimbursement policies, *see* Ex. AR N.Y. Dep't of Health, *Office-Based Surgery (OBS) Frequently Asked Questions (FAQ's) for Practicioners*, at 35 ("An OBS practice is not a health care facility under PHL Article 28 or as defined by PHL § 18.  Neither Medicaid nor Medicare provide a facility fee to private physicians' offices for office-based surgery."); NY Pub. Health §§ 230-d(h) (defining "office-based surgery" as "any surgical or other invasive procedure, requiring general anesthesia, moderate sedation, or deep sedation, and any liposuction procedure, where such surgical or other invasive procedure or liposuction is performed by a licensee *in a location other than a hospital, as such term is defined in article twenty-eight of this chapter . . . .*") (emphasis added), and United reasonably concluded a "health care facility" is limited to facilities recognized as such under New York law, by CMS, and according to industry standards.  Moreover, these plans separately define "Physician's Office Services"—i.e., covered services provided at physicians' offices—not to include facility fees.  *E.g.*, Dkt. 144-02 at MSSNY-UHG-

29

0018049-52 (Patient AQ).  This explicitly separate section discussing coverage for Physician

Office Services demonstrates that physicians' offices are *not* Alternative Facilities within the

meaning of the plans.  And because CES and other OBS practices are obviously physicians'

offices, United reasonably construed the plans not to cover OBS facility fees.[15]

       Yet another type of plan covers surgeries performed "inpatient . . ., outpatient, and at a

doctor's office."  Dkt. 144-02 at MSSNY-UHG-0010802 (Patient X).  And it specifically

provides for facility fees in the first two circumstances:  it states that "[w]hen surgery is

performed in a hospital, the hospital charges are covered under your hospital benefits," and that

"[w]hen surgery is performed on an outpatient basis, the plan covers the use of the surgical

facility, including furnished services and supplies."  *Id.*  But it does *not* provide for coverage of

facility fees at a "doctor's office."  United reasonably construed this plan not to cover OBS

facility fees, including because OBS practices are doctors' offices, and because facility fees are

specifically provided for the other types of covered surgeries but not for surgeries performed in

doctors' offices.

       Still other plans make no mention of facility fees at all.  For example, Patient AE's plan

indicates that it provides coverage for "Professional Fees for Surgical and Medical Services," but

does not discuss surgical facility fees for out-of-network providers.  Dkt. 144-02 at MSSNY-

UHG-0014290 (Patient AE).  United reasonably construed plan silence as not providing

coverage for facility fees charged by OBS practices, which is the industry standard practice

---

[15] New York requires *all* physicians' offices that serve as the setting for office-based surgery
to be accredited as OBS practices, so New York OBS practices fall within the definition of
"physicians' offices" under these United plans.  *See* NY PHL § 230-d(3) ("A licensee may only
perform office-based surgery in a setting that has obtained and maintains full accredited status");
Dkt. 144-02 at MSSNY-UHG-00113655 (Patient AC).

(including the practice of CMS and the State of New York), and is in accord with the common industry understanding that OBS practices do not qualify as "facilities" in the first place.

As United's summary judgment motion shows, these examples of plan variation are illustrative rather than exhaustive. And while United believes it has reasonably construed all its plans as precluding coverage for OBS facility fees, the important point here is that the Court will have to analyze each and every plan to determine whether each provides coverage. Given this inherently individualized inquiry, commonality is plainly lacking, and classwide adjudication is thus impossible.

Plaintiffs' contrary arguments are wholly unpersuasive. Plaintiffs suggest that commonality is satisfied because 48 of the claims in the sample arise under plans with a common definition of "Alternate Facility" or "Ambulatory Surgical Center." Br. 12. But coverage under an ERISA plan is not determined by the plan's definition section, but by the provisions *granting coverage*. Thus, Plaintiffs' myopic focus on the definition sections of these ERISA plans is "inconsistent with well established principles of contract construction," applicable in all ERISA actions, requiring "that all provisions of a contract be read together as a harmonious whole." *Kinek v. Paramount Commc'ns, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994); *see Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008) (when "interpreting the terms of an ERISA plan," courts "examine the plan documents as a whole") (quoting *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1082 (10th Cir. 2004); *see also Boesel v. Chase Manhattan Bank, N.A.*, 62 F. Supp. 2d 1015, 1029 (W.D.N.Y. 2009) ("[T]his dispute does not turn upon one section of the plan viewed in isolation, but rather, upon an interpretation of the plan as a whole."). And the problem for plaintiffs is that, as explained above, the provisions relevant to

the plans' scope of coverage not only make clear that OBS facility fees are not covered, but (more important for present purposes) vary significantly.

Indeed, even accepting for the moment Plaintiffs' argument that what matters is the plans' definitions sections, the definitions that Plaintiffs rely on do not apply to roughly 30% percent of claims at issue—indeed, Plaintiffs admit that ten of the sample claims arise under plans that do not have a facility definition at all.  Plaintiffs can hardly contend that the applicable plan terms are uniform when even the purportedly common evidence they identify does not apply to a large swath of the named plaintiff's own claims.

Plaintiffs also assert that all of United's plans must be construed to cover OBS facility fees because: (i) the plans uniformly cover "outpatient surgery facility fees"; and (ii) "no language" in the plans expressly "restricts outpatient surgery facility-fee coverage to Article 28 providers."  Br. 18.  But Plaintiffs never explain why it matters that outpatient surgery facility fees are allegedly covered.[16]  It does not.  The key coverage question is not whether outpatient surgery facility fees are covered, but whether such coverage includes coverage of facility fees charged *by OBS practices*.  Again, at least for many of the plans at issue, the answer to that question will be no—but the court will have to parse the language of individual plans to make that determination.  *See supra* at 25-31.  Plaintiffs disagree because (they say) no plan language expressly excludes OBS providers from coverage, but there is obviously no contract interpretation or ERISA principle that requires such an express exclusion.  Rather, Plaintiffs have

---

[16] Citing a United Interrogatory Response, Plaintiffs assert that "United admits that its Plans all cover facility fees in connection with outpatient surgery."  That is a gross misrepresentation of what United stated.  United stated only that "[f]or purposes of this case, United will not advance the contention that the plans associated with the claims listed in Exhibit A … never provide benefits for outpatient surgery facilities, without regard to the location in which such services are provided."  Ex. AS.

32

the burden of proving that each plan *grants* coverage, and if United reasonably interpreted each particular plan's terms not to extend coverage to OBS facility fees, then Plaintiffs' claims under those plans will fail.  Nor is it surprising that the plans do not restrict "outpatient surgery facility-fee coverage to Article 28 providers."  Br. 18.  Article 28 is a specific section of New York law that regulates hospitals and ambulatory surgical centers, but plan coverage typically is not limited to the boundaries of a specific state, so there is no reason to expect that the plans would cite a specific section of New York law to define the scope of coverage.[17]

Likely recognizing that plan-specific inquiries preclude certification, Plaintiffs now assert for the first time that all of the plans, no matter the plan language, *must* cover OBS facility fees under the Affordable Care Act's (ACA) anti-discrimination provision, 42 U.S.C. § 300gg-5, as incorporated into ERISA, 29 U.S.C. § 1185d.  Br. 19.  That argument is wrong on the merits for the reasons explained in United's contemporaneously filed summary judgment motion.  United MSJ at 34.  But even if it were right, it could not possibly save Plaintiffs' class certification motion from the otherwise fatal variance in plan language.  After all, their argument does not even purport to *construe* the terms of the plans.  Rather, Plaintiffs are asking for *reformation*— they say they are entitled to OBS facility fee coverage "*regardless* of Plan language."  Br. 19.  And the "Supreme Court has made clear that courts may invoke ERISA § 502(a)(1)(B) only to enforce the terms of the Plan 'as written.'"  *Laurent v. PricewaterhouseCoopers LLP*, 2017 WL 3142067, at *4 (S.D.N.Y. July 24, 2017) (Oetken, J.) (quoting *Cigna Corp. v. Amara*, 563 U.S.

---

[17] In any event, as discussed on page 28, *supra*, Plaintiffs are incorrect that none of the plans restrict outpatient facility coverage to Article 28 providers.  The fully-insured plans for Patients AC, AG, AJ, BK, BM, and BN only provide facility fees to licensed facilities (including "Ambulatory Surgical Centers") and define "Facility," in relevant part, as a provider "certified under Article 28 of the New York Public Health Law (or other comparable state law, if applicable)." *See, e.g.,* Dkt. 144-02 at MSSNY-UHG-0013655 (Patient AC).

421, 436 (2011)).  It follows that if, after reviewing a plan's language, the Court concludes that it

does not cover OBS facility fees, then § 1132(a)(1)(B) does not grant the Court the authority to

enforce the plan as if it did, § 2706 notwithstanding.  *See id.* at *6 ("courts have consistently

refused" to allow relief under § 1132(a)(1)(B) "where the plaintiffs sought to enforce the plan

not as written, but as it should properly be enforced under ERISA" (quoting *Pender v. Bank of

Am. Corp.*, 788 F.3d 354, 362 (4th Cir. 2015)).[18]  Plaintiffs' ERISA claims, in other words,

depend entirely on the *plans'* scope of coverage, and they thus cannot escape the fact that the

plan language defining that scope of coverage varies across plans and thus defeats commonality.

Finally, Plaintiffs contend that common evidence shows that they are entitled to benefits

because United covered OBS facility fees for in-network providers.  Br. 17.  That is a non-

sequitur—Plaintiffs never explain how this supposedly common evidence will advance their

claims at all.  It won't.  United's motive for denying one benefit claim, or for paying another

benefit claim, does not answer the key question whether each plan at issue promises coverage for

facility fees charged by OBS practices.  Only individualized inquiries can.  Thus, even if

evidence of an allegedly inconsistent plan construction were a factor that a court should consider

in evaluating a benefit denial, as the court suggested in *Biomed Pharmaceuticals, Inc. v. Oxford

Health Plans (N.Y.), Inc.*, 831 F. Supp. 2d 651, 662 (S.D.N.Y. 2011), that would not help

Plaintiffs' argument in support of class certification because each ultimate benefit determination

still turns on the terms of each individual plan.[19]

---

[18] As this Court correctly held in *Laurent*, moreover, reformation is available under
§ 1132(a)(3) only for "cases of fraud and mutual mistake."  *Id*. at *8.  It is not available where, as
here, the plaintiff claims that the plan terms violate ERISA.  *Id*.

[19] Plaintiffs cite the statement in *Durakovic v. Building Service 32 BJ Pension Fund*, 609
F.3d 133 (2d Cir. 2010), that courts should consider a plan administrator's "decisionmaking
deficiencies," Br. 16 (citing *Durakovic*, 609 F.3d at 140), but fail to mention that the court made
that statement in the context of explaining how to determine whether a plan administrator

34

In any event, Plaintiffs badly misconstrue the record.  Plaintiffs assert that "[c]ommon evidence will show that United covered OBS facility-fee charges for in-network providers," Br. 17, but the record in fact shows the opposite.  As a matter of company policy, United does *not* contract with OBS providers—whether in-network or out-of-network—to reimburse facility fees. *See, e.g.*, Ex. AT; Dkt. 144-13 at FALK- 30(B)(6)_001-002.  And the discovery record shows numerous instances in which United cited this longstanding policy in refusing to pay facility fees to in-network providers.  United's April 12, 2019 Statement of Undisputed Material Facts (forthcoming, hereinafter "SUMF") ¶¶65; 68; 90.  It is true that United did reimburse *one* in-network provider for OBS facility fees, in part because individual United employees were confused about its accreditation status.  *See*, e.g., Ex. AU, Dkt. 144-13 at HICKS-30(B)(6)_059; Ex. AV (April 2011 email chain in which United employee John Monaghan explains that he allowed OBS practice ███████████████████████ to join United's agreement with the ███████████████████ based on the erroneous understanding that New York's OBS law would treat ██████ differently than other OBS practices because "(1) the deal is an amendment to the hospital agreement and (2) it's a university practice.").  United took steps to remedy those erroneous payments, and they are no longer being made.  *See, e.g.*, Ex. AT at 140:4-13; 328:1-331:12; *see also* SUMF ¶¶ 73-79.

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

---

labored under a *conflict of interest*—*not* as a standalone reason for finding coverage or remanding benefits denials.  The Second Circuit's actual holding was that the plaintiff was entitled to benefits as a matter of law because she proved that she was disabled *under the terms of her plan*, 609 F.3d at 141-42.



Specifically, United employs a credentialing process for all in-network providers at the time they contract with United to ensure they have the necessary licensure to be reimbursed facility fees.  *See* Ex. AT at 27:9-17, 80:9-22; SUMF ¶¶ 74, 90.

and even if it did not, the evidence to which Plaintiffs misleadingly point would not in any way allow them to avoid the individualized inquiries that render classwide adjudication of their claims impossible.

*  *  *

Plaintiffs' claims for benefits necessarily turn on the terms of each class member's individual health benefit plan.  These benefits claims thus are simply not amenable to classwide adjudication.

36

3.    *Plaintiffs' Claim For Injunctive Relief Likewise Lacks Commonality*

Plaintiffs argue that they are also entitled to injunctive relief because (according to Plaintiffs) United instituted and applied a uniform policy of denying coverage for OBS facility fees without reference to specific plan language, and class members are thus entitled to a "first-time" review by United of each claim.  That assertion is factually incorrect but, more important, it requires the same plan-by-plan, individualized inquiry described in the previous two sections, and thus precludes commonality for the same reasons.

Contrary to Plaintiffs' principal assertion, United absolutely does "consult[] or rely[] on the actual written terms of its Plans," Br. 15, when making benefits determinations—it simply does not *manually* adjudicate each claim for benefits.  As explained in greater detail in United's accompanying Motion for Summary Judgment, United adjudicates the vast majority (80-85%) of health benefit claims using an automatic adjudication system that incorporates each plan's specific benefit terms as interpreted by United.  United MSJ at Parts I.B & Factual Background (D).  In particular, a United team reviews individual plan terms during the process of drafting and negotiating terms with a customer, then uses the ███████████████ to install the plan's specific benefit terms into the automatic adjudication system.  This system allows United to auto-adjudicate benefit claims in accordance with the coverage provisions *of each individual plan*, but avoids requiring a United employee to manually review the governing plan each time a claim is submitted, because the system automatically follows the logic of the plan terms for each claim adjudication.  Roughly 15-20% of claims present issues that require manual adjudication, in which case individual claims adjudicators are tasked with assessing the claim and applying United's applicable policies and plan interpretations.

Plaintiffs simply assume that because United *denies* claims for OBS facility fees, it must have a uniform policy that it implemented without considering plan language.  But the evidence

shows that United in fact has a longstanding practice of vetting the language in each plan it administers at the time it is onboarded into United's systems to ensure the plan's benefit provisions are consistent with United's standard claim adjudication practices and default interpretive positions.  United MSJ at Part I.B.  Some plan language is drafted by United, while other plan language is drafted by plan sponsors.  *Id*.   All plan language, however, is vetted by numerous United personnel, and any benefit provisions identified as potentially inconsistent with United's standard claim adjudication practices and default interpretive positions is subjected to a further "Benefit & Administrative Review" process that involves numerous subject matter and technical experts who are tasked with determine whether and how the nonstandard benefit provisions can be administered.  *Id.*  To the best of United's knowledge, no plan sponsor has ever sought to add a provision to its plan that would facility fee benefits for surgeries performed in non-facility settings, or that would define OBS practices as "facilities" in contravention of the common industry understanding that they "offices."  *Id*.  In other words, United's systems deny OBS facility fee claims precisely *because* United has implemented processes to ensure the plans it administers do not extend such coverage.

There is no requirement, under ERISA or otherwise, that a claims administrator refer to the terms of each claimant's plan every time a claim is made, rather than determining what benefits the plan does and does not cover at the outset and making later coverage determinations based on that initial assessment.  *See* Ex. AX.  Department of Labor Benefit Claims Procedure Regulation FAQs at B-4 (In implementing regulations under ERISA, the Department of Labor "did not intend to prescribe any particular process or safeguard to ensure and verify consistent decision making by plans," but "intended to preserve the greatest flexibility possible for designing and operating claims processing systems consistent with the prudent administration of

38

a plan" and allows administrators to apply "procotols, guidelines, criteria, rate tables, fee

schedules, etc." to assist the claim adjudication process) (citing 29 C.F.R. § 2560.503-1(b)(5)).

And since there is nothing unlawful about this general approach, Plaintiffs could only even

plausibly be entitled to injunctive relief if there were a flaw in United's interpretation of a

particular plan at the time its benefit terms were loaded into United's automatic claim

adjudication system.  And that inquiry is, again, necessarily plan-specific and individualized,

defeating commonality.  *See Lipstein*, 296 F.R.D. at 290 ("[T]he question is not whether United

policy is improper; rather, the question is whether United's policy is improper according to the

terms of *each* plan giving rise to a claim.  These inquiries cannot be completed without the

Court's careful attention to the plan language and likely would not lead to the same answer for

each claimant.").[20]

## II.   PLAINTIFFS HAVE NOT ESTABLISHED ANY OF THE ELEMENTS OF RULE 23(b)

Even if Plaintiffs could establish each of the Rule 23(a) elements, they cannot satisfy any

of the Rule 23(b) elements.

### A.   Plaintiffs Are Not Entitled To Certification Under Rule 23(b)(1)

Rule 23(b)(1) authorizes district courts to certify classes seeking equitable relief where

the prosecution of separate actions by the individual class members would lead to "incompatible

standards of conduct for the party opposing the class" or decisions that would effectively dispose

---

[20] This is particularly true because the plan drafting and vetting process varies by plan and customer.  Some customers adopt "template" plan documents drafted by United; some take template plan documents and add or substitute customized plan terms, which United employees then review for consistency with United's standard claim adjudication policies; and others provide United with their own SPDs, which United employees review in whole for consistency with United's standard claim adjudication policies.  *See* Dkt. 144-12 at FALK-30(B)(6)_005 - 006.

of the class's claims.  Fed. R. Civ. P. 23(b)(1).  In particular, "Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)."  *Amchem*, 521 U.S. at 614 (quotations omitted).  Thus, to certify a class under Rule 23(b)(1)(A), the plaintiffs must establish two separate prerequisites.  First, "there obviously must be a risk that separate actions will in fact be brought if a class action is not permitted."  Charles A. Wright, et al., 7AA *Fed. Prac. & Proc.* § 1773 (3d ed. 2018).  Second, the defendant must have uniform legal obligations to the class such that "different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct."  *Id*.

Plaintiffs here satisfy neither prerequisite.  To start, Plaintiffs do not even argue that separate actions will in fact be brought if class certification is denied.  On the contrary, Plaintiffs assert that United has wrongfully denied benefits for OBS facility fees since at least 2011, and yet they are "unaware of any ongoing litigation" concerning these denials "by individual members of the proposed class."  Br. 34.  In the absence of any evidence or argument regarding the likelihood of individual actions, "there is no danger that incompatible standards of conduct will be formulated by the courts."  Wright, *supra* at § 1773; *see Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir. 1968).

Nor would United be subject to inconsistent standards even if individual suits were likely.  While Rule 23(b)(1)(A) is often applicable in ERISA cases involving the same or similar plan terms, *see* Br. 26-27, a defendant will not be subject to incompatible standards where it owes the class differing obligations based on differing plan terms, *see In re WellPoint*, 2014 WL 6888549, at *20 (holding that "[b]ecause WellPoint's UCR obligations differ between its plans, there is no

risk that separate lawsuits would result in 'incompatible standards of conduct'") (quoting Fed. R. Civ. P. 23(b)(1)); *see also Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 633 (6th Cir. 2011) (reversing certification of a Rule 23(b)(1)(A) class where administrator owed different obligations to the class); *Bowe Bell + Howell Co. v. Immco Emps.' Ass'n*, 2005 WL 1139645, at *5 (N.D. Ill. May 11, 2005) ("[T]here is no potential for inconsistent adjudications under Rule 23(b)(1)(A) if Plaintiff is required to issue medical benefits to some putative class members but not others because of factual differences between the retired employees."). Moreover, that United might be ordered "to reprocess some OBS facility-fee claims, but not others," Br. 26, is not sufficient to trigger Rule 23(b)(1)(A), because "the mere possibility that a defendant might be liable for payments to some potential class members but not to others does not constitute the 'incompatible standards of conduct' of concern in [the] Rule." *Vaughter v. E. Air Lines, Inc.*, 817 F.2d 685, 690 (11th Cir. 1987); *see Ballas v. Anthem Blue Cross Life & Health Ins. Co.*, 2013 WL 12119569, at *13-15 (C.D. Cal. Apr. 29, 2013) (denying certification under Rule 23(b)(1)).

Rule 23(b)(1)(B) is inapplicable for the same reason. Whereas "Rule 23(b)(1)(A) considers possible prejudice to a defendant, . . . [Rule] 23(b)(1)(B) looks to prejudice to the putative class members." *Ballas*, 2013 WL 12119569, at *13 (quotations omitted). In both cases, certification is improper where, as here, differing legal obligations owed by the defendant to different class members negate the need for (and practicality of) uniform classwide injunctive relief. *See In re WellPoint*, 2014 WL 6888549, at *20. Certification under that subsection is also inappropriate because Plaintiffs have not alleged that their interests might be harmed by anything "more than [the fact] that an individual adjudication may be given stare-decisis effect in other lawsuits." Charles A. Wright, et al., 7AA *Fed. Prac. & Proc.* § 1774 (3d ed. 2018). To

proceed under this subsection, "some greater practical effect must be shown," *id.*—for instance, a fund whose assets would be insufficient to satisfy each individual plaintiff's claims—but Plaintiffs have "made no such showing," *Wu v. Pearson Educ., Inc.*, 277 F.R.D. 255, 276 (S.D.N.Y. 2011), *motion for decertification granted by* 2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012).

### B.    Plaintiffs Are Not Entitled To Certification Under Rule 23(b)(2)

Certification under Rule 23(b)(2) also is not warranted.  Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Supreme Court has "clarified that certification of a class for injunctive relief is only appropriate where 'a single injunction would provide relief to each member of the class,'" meaning the injunctive relief requested must at least be "beneficial" to each class member.  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97 (2d Cir. 2015) (quoting *Dukes*, 564 U.S. at 360); *see Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012).

The "reprocessing" injunction that Plaintiffs seek "would clearly not benefit all (if, indeed, any) members of the class."  *Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397, 407 (W.D.N.Y. 2013).  That is because reprocessing itself will not benefit any class member—and it could not benefit any class member whose plan does not cover OBS facility fees, *see supra* at 27-31, as multiple courts in the ERISA context have recognized, *see, e.g.*, *In re WellPoint*, 2014 WL 6888549, at *21; *Lipstein*, 296 F.R.D. at 292.  Instead, reprocessing "would only lay an evidentiary foundation for subsequent individual determinations of liability and damages," which precludes Rule 23(b)(2) certification.  *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (rejecting under Rule 23(b)(2) an injunction requiring insurer to

reinspect class members' roofs under permissible policy because reinspection would not necessarily entitle any class member to additional coverage); *see Jamie S.*, 668 F.3d at 499 (Rule 23(b)(2) not satisfied where injunction "merely establishes a system for eventually providing individualized relief"). In other words, the injunctive relief that Plaintiffs seek is not "final" or "appropriate" as to the class "as a whole" because it will benefit only those class members whose plans actually cover OBS facility fees.

### C.     Plaintiffs Are Not Entitled To Certification Under Rule 23(b)(3)

Finally, Plaintiffs are not entitled to certification of a damages class under Rule 23(b)(3). Setting aside for the moment the Rule's requirements, Plaintiffs' request for damages is substantively inappropriate because an outright award of benefits is prohibited under ERISA "unless [the court] can conclude that there is no possible evidence that could support a denial." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013) (quotations omitted). Plaintiffs recognize the rule, *see* Br. 25, but do not show that it is satisfied. It is not, for the reasons already discussed—*viz.*, classwide damages would impermissibly award benefits even under plans that do not cover OBS facility fees, or for other reasons having nothing at all to do with this dispute. In other words, certifying a Rule 23(b)(3) would likely result in the award of damages to class members to whom coverage is not owed.

Regardless, Plaintiffs cannot prove that common questions predominate over individualized ones and that the class action mechanism is superior. Fed. R. Civ. P. 23(b)(3).[21]

---

[21] If the Court were to conclude that the class is certifiable under Rule 23(b)(1), that should preclude certification under Rule 23(b)(3). *See Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 685 (2d Cir. 1977).

1.      _Plaintiffs Have Not Shown That Common Questions Predominate_

"Like the commonality inquiry, a court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized roof will be needed to establish each class member's entitlement to relief." _Johnson v. Nextel Comm'ns Inc._, 780 F.3d 128, 138 (2d Cir. 2015) (quotations omitted). But predominance is far more demanding than commonality, because it "requires a further inquiry . . . into whether the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." _Id_. Predominance thus requires courts to "give careful scrutiny to the relation between common and individual questions in a case." _Tyson Foods, Inc. v. Bouaphakeo_, 136 S. Ct. 1036, 1045 (2016). Only where common questions "predominate over" individual ones—that is, where common questions "are more prevalent or important"—is class treatment appropriate. _Id_. (quotations omitted). Where deciding the claims of a class will eventually devolve into a "series of mini-trials," a putative class action cannot satisfy the predominance requirement. _Moore v. PaineWebber, Inc._, 306 F.3d 1247, 1253 (2d Cir. 2002) (Sotomayor, J.).

Applying these standards, "[c]ourts have consistently denied certification under Rule 23(b)(3) where the claim for relief under ERISA requires the court to perform an individualized assessment for each member of the proposed class to determine entitlement to a benefit." 1 _McLaughlin on Class Actions_ § 5:52 (15th ed. 2018); _see, e.g._, _In re WellPoint_, 2014 WL 6888549, at *21; _Lipstein_, 296 F.R.D. at 293; _Franco_, 289 F.R.D. at 135-37; _Pa. Chiropractic Ass'n_, 286 F.R.D. at 374. Here, the court must perform multiple individualized assessments, squarely foreclosing a finding of predominance. Specifically, the court must parse the language

44

of various divergent anti-assignment provisions *and* purported assignments simply to determine who holds a valid claim, and it separately must conduct a plan-specific inquiry to determine whether OBS facility fees are in fact covered.  *See supra* at Part I.B.  Adding damages calculations to the mix will only make things worse.  "These questions are not collateral issues that could be determined in individual hearings after common questions are resolved for the class—they go to the heart of defendants' liability for each class member's alleged injury." *Johnson*, 780 F.3d at 146.  Plaintiffs' common questions, by contrast, at best speak marginally to the core liability questions in this case.  *See supra* at Part I.B.2.  Plaintiffs are right that "predominance requires a qualitative assessment of importance of individual versus common questions," Br. 32 (quotations omitted), which is precisely why predominance is not satisfied in this case.

2.  *Plaintiffs Have Not Shown That Class Litigation Is Superior*

Rule 23(b)(3)'s superiority requirement ensures that a class action represents the best available method "for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Rule provides a non-exhaustive list of factors to guide courts in their analysis, the "most critical" of which is "the likely difficulties in managing a class action."  *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 147 (S.D.N.Y. 2015); *see Sykes*, 780 F.3d at 82.  Rule 23(b)(3) thus requires courts to consider "the whole range of practical problems that may render the class action format inappropriate for a particular suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

For the reasons discussed above, practical problems foreclose certification.  Both elements of Plaintiffs' claims require individualized inquiries that will need to be replicated on a massive scale to try this case to judgment.  *See, e.g.*, *Adkins*, 307 F.R.D. at 147 ("When there is

45

no uniform trial that could address the discrete issues presented, a case fails the predominance and superiority criteria of Rule 23(b)(3)." (quotations omitted)).  Superiority is not satisfied where, as here, there is a "need for 'mini-trials' to resolve individual issues."  *Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 287 F.R.D. 216, 230 (S.D.N.Y. 2012); *see Spagnola*, 264 F.R.D. at 99 (same).

Nor do the Rule 23(b)(3) factors point toward certification.  Plaintiffs do not contend that this is a negative-value suit, so "[t]he most compelling rationale for finding superiority" is missing.  *Castano v. Am. Tobacco Co*, 84 F.3d 734, 748 (5th Cir. 1996).  Indeed, ERISA authorizes attorney's fees, *Hardt v. Reliance Standard Life Insurance Co.*, 560 U.S. 242 (2010) (construing 29 U.S.C. § 1132(g)(1)), which strongly "militates against a need for class treatment" by relieving successful plaintiffs of the cost of litigation, no matter how small their claims.  1 *McLaughlin on Class Actions* § 5:64 (15th ed.).

Plaintiffs do assert that they are "unaware of any ongoing litigation concerning the dispute by individual members of the proposed class," Br. 34, but the absence of identical actions does not cut *in favor* of certification; it simply means that Rule 23(b)(3)'s second factor is "neutral" at best.  *Roadhouse v. Las Vegas Metro. Police Dep't*, 290 F.R.D. 535, 547-48 (D. Nev. 2013); *see also, e.g.*, *Gibbs Props. Corp. v. CIGNA Corp.*, 196 F.R.D. 430, 442 (M.D. Fla. 2000).  This factor "is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits" and inconsistent judgments, Charles A. Wright, et al., 7AA *Fed. Prac. & Proc.* § 1780 (3d ed. 2018)—concerns that simply are not implicated when no other similar suits are pending, *see, e.g.*, *Roadhouse*, 290 F.R.D. at 547-48.

Likewise, Plaintiffs' observation that this dispute concerns "reimbursement for services that Plan members received from New York OBS providers," Br. 35, means that there is little

risk that Plaintiffs' claims will be brought elsewhere if the class is not certified.  Class

certification, in other words, is not needed to ensure that Plaintiffs' claims are litigated

consistently under the same law.

### D.   Plaintiffs Cannot Rely On Issue Certification Under Rule 23(c)(4) To Evade Defects In Their Class Certification Motion.

As a fallback, Plaintiffs urge the Court to carve their claims into discrete issues and

certify issue classes under Rule 23(c)(4).  But the issues they seek to certify are the very same

ones that fail commonality.  And it is axiomatic that unless the "subclass on each issue"

"independently meet all of the requirements of subsection 23(a) and at least one of the categories

specified in subsection (b)," issue certification is improper.  *In re Methyl Tertiary Butyl Ether*

*("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 351 (S.D.N.Y. 2002).  Issue certification is

likewise inappropriate where (as here) certifying an issue "would not materially advance the

litigation because it would not dispose of larger issues."  *Abu Dhabi Commercial Bank v.*

*Morgan Stanley & Co. Inc.,* 269 F.R.D. 252, 256 (S.D.N.Y. 2010) (quotations omitted).

More specifically, Plaintiffs seek to certify each of the three liability questions addressed

in Part I.C above—(i) which potential class members have standing and whether the terms of any

United Plan cover OBS facility fees; (ii) whether United denied coverage for OBS facility fees

based on a uniform company policy; and (iii) whether United covered OBS facility fees for in-

network providers.  But as discussed above, certification of any of those questions would itself

raise individualized questions that render certification improper.  The key liability question—

which potential class member plaintiffs have standing and whether the terms of any United Plan

cover OBS facility fees—cannot be resolved through "common evidence," Br. 15, 18, without an

individualized inquiry into the disparate language in each class member's ERISA plan and

purported assignment.  *See supra* at 27-31; *accord In re WellPoint*, 2014 WL 6888549 at *21-*22

(denying issue certification because (like here) liability depended on an individualized review of the health plans at issue).  And resolution of the latter two questions Plaintiffs hypothesize—whether United denied coverage for OBS facility fees based on a uniform company policy and whether United covered OBS facility fees for in-network providers—would not "materially advance the litigation."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008).  As explained above, even if Plaintiffs were right that United denied Plaintiffs' claims per a uniform policy or in furtherance of its own financial interest, they could not prevail.  Rather, they would still have to make the showing that they desperately seek to avoid, namely, that each putative class member has standing and is entitled to coverage under the terms of her own plan.  *See supra* at Part I.B.  These unavoidable questions render class certification categorically improper in this case for the reasons explained above.

"[G]iven the number of questions that would remain for individual adjudication, issue certification would not 'reduce the range of issues in dispute and promote judicial economy.'"  *McLaughlin*, 522 F.3d at 234 (quoting *Robinson v. Metro–N. Commuter R.R.,* 267 F.3d 147, 168 (2d Cir. 2001)).  Because "this is not a case in which certifying an issue class resolves the many problems with class treatment," Plaintiffs' request for issue certification should be denied.  *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1750595, at *20 (S.D.N.Y. Apr. 11, 2018).

## CONCLUSION

For the foregoing reasons, United respectfully requests that the Court deny Plaintiffs' motion for class certification.[22]

---

[22] Many of Plaintiffs' exhibits consist in whole or in part of hearsay that they cannot rely on to prove the truth of the matter asserted.  *See* Exs. 28 (PowerPoint), 37, 38, 43, 45, 51.

Dated:  April 12, 2019
        Washington, D.C.

Respectfully submitted,

By: */s/ Gregory F. Jacob*


ANTON METLITSKY
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

BRIAN D. BOYLE (*pro hac vice*)
GREGORY F. JACOB (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414


*Attorneys for Defendants UnitedHealth Group Incorporated, United HealthCare Services, Inc., United HealthCare Insurance Company, United HealthCare Service LLC, Optum Group, LLC, Optum, Inc., and Oxford Health Plans LLC*