UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――――――

THE MEDICAL SOCIETY OF THE
STATE OF NEW YORK, *et al.*,
                       Plaintiffs,

        -v-

UNITEDHEALTH GROUP, INC., *et al.*,
                       Defendants.

16-CV-5265 (JPO)

FINDINGS OF FACT
AND CONCLUSIONS OF LAW

―――――――――――――――――――――――――――――――――――

J. PAUL OETKEN, District Judge:

      The central issue in this class action is whether a health insurer violated ERISA (the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*) when it determined that physicians performing office-based surgeries in the state of New York are not entitled to a "facility fee." Plaintiffs are two organizations — the Medical Society of the State of New York ("MSSNY") and the Society of New York Office Based Surgery Facilities ("NYOBS") — and a Manhattan medical practice, Columbia East Side Surgery, P.C. ("Columbia East Side"). Defendants are UnitedHealth Group Inc., United HealthCare Services, Inc., United HealthCare Insurance Company, United HealthCare Service LLC, Optum Group, LLC, Optum, Inc., and Oxford Health Plans LLC (collectively, "United").

      A five-day bench trial was held before this Court in February 2022. The parties subsequently filed post-trial briefs and response briefs. (*See* Dkt. Nos. 349, 352, 355, 359.)

      The Court now issues its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. The Court assumes familiarity with the background of this case and the legal conclusions set forth in the Court's prior opinions, which are deemed incorporated herein. (*See* Dkt. Nos. 59, 87, 153, 204, 214, 215, 289.)

1

I. **Findings of Fact**

   A. **Background for Adjudicating Claims**

      1. **United's Processes for Drafting and Vetting Plan Language**

United administers ERISA-governed health benefit plans. While some of these plans are fully insured, the majority are self-funded, which means that the plan sponsor pays any benefits and United acts only as a third-party administrator (known as "Administrative Services Only" or "ASO" plans). (Stip. ¶¶ 7, 21, 23.) A Certificate of Coverage ("COC") governs fully insured plans and the terms of the ASO plans are described in a Summary Plan Description ("SPD"). (Stip. ¶¶ 22–23.)

United has developed processes for adjudicating the many claims it receives every day. United maintains template plan language setting forth its standard coverage and reimbursement terms. (*See, e.g.*, Tr. 846:5-7; Ready Decl. ¶¶ 20-22.3.) United personnel review every customer COC or SPD to analyze whether it includes nonstandard language or terms. (Ready Decl. ¶¶ 20, 26, 33-34.) Proposed plan terms that potentially diverge from United's standard coverage and reimbursement policies are analyzed through the Benefits & Administrative Review ("BAR") process to determine whether United can administer them. (*See, e.g.*, DX-0447 (flowchart of BAR review process); JX0289-0005 (Administrative Options Guide summarizing BAR process); Ready Decl. ¶¶ 33-42, 52-57.) United has no BAR record of any proposed plan terms requiring payment of facility fees to physician offices. (Tr. 676:13-16; Tr. 569:4-17, 588:19-589:6; Ready Decl. ¶¶ 59-60.) Once plan terms are finalized, United creates reference documents for official use, developing a "benefit summary" for fully insured plans and a Benefit Detail Report ("BDR") for self-funded plans at the same time that the plan document is generated. (*See* Tr. 476:25-477:11, 478:6-17; Ready Decl. ¶¶ 27-29.)

United's templates, plan documents, and plan interpretations are updated to reflect legislative developments. As relevant here, when New York enacted New York Public Health Law ("NY PHL") § 230-d in 2007, United prepared a legislative bulletin alerting various business units to the law (*see* JX0185; Chapin Decl. 5 ¶¶ 53- 56), and United's in-house counsel analyzed the "wording of the law," "other state statutes," and published DOH guidance regarding the law, including a set of Frequently Asked Questions ("FAQs") posted on the DOH website, among other things (Tr. 837:10-838:24).

No plan sponsor has ever requested that United interpret or apply its plan to pay "facility fees" to physician offices. (Tr. 569:11-17; Ready Decl. ¶¶ 59-60; *see also* Tr. 849:4-11.) And the New York Department of Financial Services ("DFS") — which approves the plan terms used in all New York COCs (and prescribes them today) — has never directed United to pay facility fees to office-based surgeries under its COCs. (Tr. 562:8-16; *see also* Chapin Decl. ¶¶ 18, 51, 52.)

### 2.   United's Processes for Interpreting Plan Provisions

Although the plan terms administered by United vary somewhat, they include similar structures and provisions. Importantly, while the plans administered or insured by United cover outpatient surgical services, they distinguish between "facilities" and "physician offices" and generally reserve "facility fees" only for facilities. (*See, e.g.*, DX-1067 at pp. 1-2.) Most commonly, hospitals and "alternate facilities" are allowed facility fee reimbursements, while "physician's office services" is a distinct coverage item with no mention of facility fees. (*See, e.g.*, DX-1067 at p. 6.) COCs in recent years include DFS model language that defines a "facility" by reference to Article 28 of the New York Public Health Law. (*See, e.g.*, JX0090-0021-22.) No plan expressly provides that a physician's office is a type of "facility" entitled to separate facility fees.

All the plans at issue apply United's standard claim reimbursement policies for administering plan benefits.  (*See, e.g.*, JX0025-0042, 109, 137; JX 0033-0105, 115; JX-0083-0154, 163.)  For in-network providers, the plans commonly refer to the contracted amounts as the "allowed" or "eligible" expenses for reimbursement.  (*See* Tr. 445:17-446:6; Tr. 725:1-11; *see also* DX-1067 at 3-4.)  And for out-of-network providers, there are two reimbursement methodologies:  The reimbursement amounts are either (1) a percentage of Medicare's reimbursement amounts for the same services, or (2) a percentage of the charges that are "reasonable and customary" in the industry.  (Tr. 446:7-447:16, 448:25-449:8.)  Most plans also explicitly tie reimbursement to proper licensure, which means that United generally issues payment to the license entity (*i.e.*, the physician, for procedures performed in an office-based surgery).  (Tr. 455:4-16; *see* DX-1067 at 7.)

Neither of the reimbursement approaches for out-of-network providers allows for payment of a separate "facility fee" to an office for an office-based procedure.  (Tr. 609:19-22; DX-1034.0004; DX-0240.0001.)  The first reimbursement policy, primarily adopted from Medicare's approach, differentiates offices from facilities.  Medicare uses a global professional fee to reimburse physicians for performing surgical procedures in their offices and does not pay a separate "facility fee" to physician practices unless they are qualified as independent facilities under the applicable state law.  As relevant here, in New York, ambulatory surgery centers and other facilities require licenses under Article 28.  Because office-based surgery practices are not licensed under Article 28, they are not eligible to be paid facility fees by Medicare.  All major private payers have adopted this reimbursement practice.  (Tr. 598:5-19, 609:23-610:4; Tr. 753:2-8, 757:2-18, 768:4-770:24; Tr. 851:24-843:10; Tr. 701:1-5, 703:4-14.)  For services performed in an office, Medicare's professional fee includes compensation for the physician's

4

"practice expense," which include costs such as supplies and overhead. (Tr. 784:3-17, 804:23-805:8.) For an office-based procedure, the professional fee provided by Medicare incorporates the higher practice expense borne by the physician, but when the same procedure is performed in a facility, the practice expenses are generally borne by the facility and the physician fee is therefore reduced. The difference between a facility reimbursement rate and a non-facility rate is called the "site-of-service differential." (Tr. 595:12-592:22, 598:21.) Medicare's professional fee schedules use a differential for all surgical procedures that can, according to Medicare, be performed in either an office or facility setting. (*See* DX-0641.0011-13; Tr. 596:9-19.) United adopted Medicare's judgments on what surgical procedures can safely be performed in office and what surgical procedures must be performed in a facility. (*See* Tr. 604:1:605:4; JX0284.)

When a United plan uses a Medicare-based methodology for reimbursing out-of-network services, United uses the Medicare reimbursement fee schedule. (Tr. 608:15-609:22.) To obtain the higher physician fee rate, a physician who performs a surgery in an office must accurately bill their professional services as having been performed in an office using the code "POS 11." (Tr. 800:13-21.)

When a plan's chosen methodology for paying out-of-network claims is based on "reasonable and customary" charges in the industry, United pays a global professional fee and estimates the amount of the practice expense based on a professional charge database. (Tr. 627:24-628:14; Tr. 697:18-698:4.) United expects out-of-network providers to bill professional fees that reflect the office-based practice expenses they seek to recover for their procedures. (Tr. 609:10-18; Tr. 772:7-19.)

United has published several claim-coding and reimbursement policies to ensure that offices that bill for facility fees are not paid separate facility fees but are reimbursed through

5

global professional fees.  These policies are based on Medicare's reimbursement methodologies, including Medicare's "site-of-service" classifications (*i.e.*, using Place of Service ("POS") 11 to denote a physician's office) (*see* PX-0632; DX-0674.0012); Medicare's approach for distinguishing between procedures appropriate for an office-based setting and procedures appropriate only for facilities (*see* JX0284); Medicare's policy for compensating office-based procedures through professional fees (DX-0427); and Medicare's site-of-service differential policy (DX-0641.0012).

### 3. New York Law

Under Article 28 of the New York Public Health Law ("NY PHL"), inpatient and outpatient hospitals and freestanding ambulatory surgery centers ("ASCs") are all categorized as hospitals that may perform "ambulatory surgery," including outpatient surgery that cannot "be performed safely in a private physicians' office."  Stip. ¶¶ 25–26; NY PHL § 2801.1.  Article 28 facilities must comply with regulations setting forth space, use, and other requirements; obtain a "certificate of need" and permission to incorporate from a New York agency; maintain an active operating certificate issued by the New York Department of Health ("DOH"); prepare and follow a charity care policy; and submit for review their actions under that policy.  Stip. ¶ 27; NY PHL § 2801-a, 2805; 10 NYCRR § 709.5.

In 2007, the New York Assembly adopted NY PHL § 230-d, which created new restrictions on physicians who choose to perform certain surgical procedures in their offices. (*See* Tr. 144:2-18, 145:8-146:9; Stip. ¶ 28.)  The law does not require physician offices to obtain an Article 28 license and follow the requirements applicable to Article 28 facilities, nor does it require the offices to obtain an operating certificate.  (*See, e.g.*, DX-0509.0001.)  Instead, physician offices operate under the physician's medical license.  (*See* DX-0639.0001.)

6

Further, NY PHL§ 230-d(h) defines "office-based surgery" as "any surgical or other invasive procedure . . . performed by a licensee in a location other than a hospital, as such term is defined in article twenty-eight of this chapter," NY PHL § 230-d(h), explicitly distinguishing office-based surgical procedures from those conducted in an Article 28 facility.  Indeed, DOH guidance prohibits an office-based surgery from identifying itself as a "facility" or using the words "facility" or "center" in its business name.  (*See* DX 0253.0026; DX-0693; DX-0688.0010.)  As with Medicare, New York law "does not require an insurer to pay a claim for a 'facility fee' for surgery performed in a physician's office."  (DX-0054.0001.)  Neither New York's Medicaid program, nor the health plan that covers state employees, nor the program implementing the State's "no-fault" law pays or prescribes separate facility fees to physician's offices.  (*See, e.g.*, DX-0688.0008-10.)

      B.      **United's Claims-Adjudicating Practices for Physician's Offices**

After a plan's terms are determined by United and the plan's sponsor, United compiles key terms in a "benefit summary" or "BDR" and then uses those documents to program its claims adjudication system with those terms.  (Tr. 476:25-477:11, 478:10-479:5; Ready Decl. ¶¶ 27-29.)  This process allows United to process the majority of claims for a given plan quickly and consistently.  (Tr. 654:12-19.)  When claims are diverted to manual adjudication, United's adjudicators have access to standardized summary documents developed from the same information as the plans themselves.  (Tr. 658:25-659:15, 660:11-662:8; Tr. 476:14-477:11, 477:23-478:3.)

Around 2005, United became aware that some physician offices were obtaining facility fees by using the "facility" code when submitting claims.  (Tr. 834:2-23, 835:9-24.)  According to Louise Dobbe, in-house counsel for United, this prompted United to review its plans and the legal landscape to analyze whether the offices *should* be paid facility fees.  (Tr. 841:4-23,

847:18-850:21.)  In collaboration with administrators for the Empire Plan (the plan for New York state employees) and other United attorneys, Dobbe analyzed United's template plan language, industry guidance (including Medicare and Medicaid practice), coding standards, state law, and United's reimbursement policies.  (*See* Tr. 838:14-15, 840:9-16, 841:4-845:12, 845:13-846:18, 849:17-850:15; DX-0974.)  Dobbe also confirmed with United lawyers that no client had ever requested a plan term requiring United to treat physician offices as facilities entitled to facility fees.  (Tr. 849:8-11.)  Dobbe reviewed "[s]everal hundred" plan documents which, she testified, did not require the payment of facility fees to offices.  (Tr. 847:21-848:6.)

United then changed its standard claim adjudication to interrupt automated payments to offices that were seeking facility fees.  (*See* Tr. 710:12-711:12; Tr. 861:14-862:23.)  Under this process, known as a "C Flag," once a physician office is identified by United as billing facility fees, United places a "flag" on the provider to prevent facility-fee claims from being paid and sends a letter to the provider inviting them to provide proof of facility licensure.  (*See* Tr. 862-4-17; JX0190.)  The letter also explains that absent facility licensure, the appropriate place of service code is POS 11 (office).  (*See* JX0190.)  United also communicates the denial of facility fee claims made by physician offices in the explanation of benefits ("EOB") letters sent to both the patient and the provider, along with a letter explaining that the claims were denied because United was unable to verify that the provider may be bill as a licensed facility.  (*See* Stip. ¶¶ 39-41; JX0341; JX0012-0195-96.)

When the state legislature enacted NY PHL § 230-d in 2007, United considered whether this law required it to alter its reimbursement practice of reimbursing physician office services through professional fees and concluded that it did not.  (*See* JX0210; DX-0429.0001; Tr. 836:23-846:18.)  It therefore made no changes to its C Flag process.  (*See* Tr. 836:23-846:18.)

However, it began using the list of Article 28-licensed facilities available on the DOH website to help identify providers that were not on the Article 28 list. (*See, e.g.*, JX0190.)

### C.   Reimbursement Policies for Network and Out-of-Network Providers

Though United's claim reimbursement policies apply to both network and out-of-network providers (*see, e.g.*, Tr. 607:21-608:3; Tr. 868:5-23), United has contracted with some in-network physicians to provide non-standard reimbursement practices for office-based surgeries and other procedures (*see* Tr. 605:11-606:3). Usually, United does this by enhancing the professional fee schedule for office-based services. (*See* Tr.700:18-701:9, 702:10-703:14, 721:2-7; Tr. 608:4-14; JX0227-0002.) United's claim reimbursement policies state that they are subject to modified application in network contracts. (*See, e.g.*, JX0284.0001.)

On one occasion, as part of its renegotiation of Mount Sinai's hospital system network contract, United agreed to bring a hospital-affiliated physician office under the hospital's agreements, with provisions for separate facility fees rather than enhanced professional fee schedules. (Tr. 721:13-722:2, 723:2-724:13.)

### D.   United's Claim Adjudication Practices of Columbia East Side

Columbia East Side operates under the license of its physician owner, Dr. Darrick Antell, and has never been licensed as an Article 28 facility. (Stip. ¶¶ 13, 32.) As a result, neither Medicare nor any private payer has ever regularly paid Columbia East Side a facility fee. (*See* Antell 1/18 Dep. 49:3-50:22; Kravitz Dep. 158:8-12, 158:25-159:23.) United has informed Dr. Antell on numerous occasions that his office did not qualify as a "facility" and thus was not entitled to bill for facility fees. (*See, e.g.*, JX0148; JX0234-0001.)

### E.   Claims at Issue

In Count I, Columbia East Side alleges that United violated ERISA by failing to pay facility fees to it in accordance with the applicable plans. Columbia East Side maintains thirty-

one benefit claims on behalf of twenty-nine patients.  (*See* Stip. ¶ 43.)  The benefits claims seek a total of $1,507,102.33 for a "facility fee."  (*See* JX0341.)  United has paid Dr. Antell $400,000 in professional fees for these procedures.  (*See id.*)

In Count Two, Columbia East Side, joined by MSSNY and NYOBS, asserts a class-wide claim for prospective injunctive and declaratory relief, alleging that United has systematically violated ERISA by failing to adequately review the plans to determine whether facility fees should be paid to physician offices for office-based surgeries.  (*See* Stip. ¶¶ 9-12, 18.)

## II.     Legal Standard

ERISA § 502(a)(1)(B) allows a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B).  The Court reviews a denial of benefits under an arbitrary-and-capricious standard when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  This means that a denial of benefits may be overturned "if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).

Under the Claims Procedures Regulation issued by the Secretary of Labor, an ERISA-governed benefit plan must satisfy the procedural standards set forth in 29 C.F.R. § 2560.503-1 when processing claims for health insurance benefits.  The Claims Procedures Regulation requires plans to "establish and maintain reasonable procedures" for processing benefit claims, including "administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants."  *Id.* § 2560.503-1(b)(5).  The Regulation was promulgated under ERISA § 503(1), 29

U.S.C. § 1133(1), which requires plans to provide adequate notice to plan participants of the "specific reasons" for a benefit denial, and to afford a "reasonably opportunity" for a "full and fair review" of the denial. *See also* 29 C.F.R. § 2560.503-1(g)(1). The substantive standard imposed by the Claims Procedures Regulation is reasonableness, and the Court must therefore determine whether United's procedures were reasonable, according deference to determinations as to which United may exercise its discretion. *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 58 (2d Cir. 2016).[1]

### III. Conclusions of Law

The Court first addresses Count II of the Complaint, which seeks declaratory and injunctive relief that United's systematic application of its refusal to pay facility fees to physician offices violates ERISA. It then addresses Count I, which covers Columbia East side's benefit claims.

#### A. Declaratory and Injunctive Relief

The Court concludes that Plaintiffs have failed to demonstrate that United's process for adjudicating the claims at issue violates ERISA. United implemented reasonable systems designed to ensure that coverage determinations accord with plan terms and sufficiently explained to Plaintiffs why they were denied facility fee claims submitted for office-based procedures.

---

[1] The Court is not persuaded by Plaintiffs' argument that a "de novo" standard should apply here. First, the Court finds that United did sufficiently review the pertinent plan terms as part of its claims adjudication processes. Second, United adequately communicated its reasons for adverse determinations to plan members. And in any event, the ultimate standard under ERISA turns on the reasonableness of the claims administrator's interpretation. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008).

First, the Court concludes that the evidence at trial demonstrated that United sufficiently reviewed its plan terms with regard to facility fee claims submitted by office-based surgeries. United reviews its plan terms before it agrees to administer a plan, and it then uploads those terms into United's automated claims adjudication system. These terms are also reflected in summary documents used by manual adjudicators to determine benefits claims.

Dobbe also testified that around 2005, and in collaboration with administrators for the Empire Plan (the plan for New York state employees) and other United attorneys, Dobbe analyzed United's template plan language, industry guidance (including Medicare and Medicaid practice), coding standards, state law, and United's reimbursement policies to determine whether facility fees were due for office-based procedures. (*See* Tr. 838:14-15, 840:9-16, 841:4-845:12, 845:13-846:18, 849:17-850:15; DX-0974.) She also reviewed "[s]everal hundred" plan documents and determined that they did not require the payment of facility fees to offices. (Tr. 847:21-848:6.) The Court finds that Dobbe was credible and that she did, in fact, review individual plan terms and was familiar with the range of plan terms. This finding is supported by the fact that, based on the Court's own review of the sampling of plan language available in the record, none of the plans had language plainly requiring United to pay facility fees to physician offices and many clearly precluded such payments. Furthermore, the Court finds persuasive the fact that Medicare conventions, other insurers, and New York law support United's determination that a physician office is not a facility and is therefore not entitled to separate facility fees. Though Plaintiffs argue that this information is irrelevant to what United's plans cover, the Court disagrees. This information provides important background information and context relevant to how the plans were created and how United reasonably determined that the plans did not provide for a separate facility fee for procedures performed in physician offices.

Nor does the Court find convincing that United, on one occasion, contracted with an in-network provider to reimburse facility fees to a physician's office within that network. United is entitled to negotiate contract terms and this does not render its general policy of refusing to pay facility fees to physician offices unreasonable.

The Court therefore cannot conclude that United was unreasonable in its review of the plans and in the formulation and implementation of its process for handling facility fee reimbursement requests from physician offices.

Second, the Court concludes that the C Flag process was a reasonable way to ensure that benefits are administered consistent with plan terms. Having reasonably determined that its plans do not require the payment of facility fees to physician offices, United implemented a consistent approach to effectuate that interpretation. United is under no obligation to re-examine an entire plan document every time a new claim is filed. *See* 29 C.F.R. § 2560.503-1(b)(5).

And third, Plaintiffs have failed to demonstrate that United did not sufficiently explain to class members the reason why their claims were denied. When a claim is flagged under the C Flag process, explanation-of-benefits letters are sent to both the patient and the provider. Although different United affiliates used different language at different points in time, the Court finds that all the variations adequately communicate that the claim has been denied because the entity is not licensed to bill as a facility, and that the provider should contact provider verification services to have the claim reconsidered. This sufficiently satisfies the notice provision of the Claims Procedures Regulation.[2]

The Court therefore finds for United on Count II.

---

[2] Even if the Court determined this was not sufficient notice, this would not support the remedy sought by Plaintiffs, as any deficiency in the notice does not call into question whether that claim determination was correct.

### B.   Columbia East Side Claims

For the same reasons detailed above, the Court concludes that Plaintiffs have failed to demonstrate that United erred in its adjudication of the claims filed on behalf of Columbia East Side's patients.  United had discretion to determine coverage questions, and Plaintiffs have not shown that United's interpretation of the plans at issue was without reason.  Even more compelling is the fact that the plans covering these thirty-one claims distinguish between "offices" and "facilities," and some of the plans explicitly define "facility" to require an Article 28 license.  Not one of the plans explicitly confers "facility fee" benefits for physician offices.

Because Columbia East Side is not an Article 28 license facility, and the Court concludes that United was reasonable in determining that offices without an Article 28 license are not entitled to separate facility fees, the Court finds for United on Count I.

### IV.   Conclusion

Based on the above findings of fact and conclusions of law, the Court finds in favor of Defendants on all counts.

The Clerk of Court is directed to enter final judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated: September 14, 2022
       New York, New York

_____
J. PAUL OETKEN
United States District Judge